HON. JNO. H. BURFORD, CHIEF JUSTICE.
HON. JNO. L M'ATEE,
HON. BAYARD T. HAINER,
HON. BENJ. F. BURWELL;
HON. CLINTON F. IRWIN,

ASSOCIATE JUSTICES.

*VEEDER B. PAINE v. JOHN FOSTER *et al.*

(Filed Feb. 13, 1896.)

1. PUBLIC LANDS — *Conflicting Claimants — Decision of Land Department— Conclusive, When.* The land department is a tribunal appointed by

[* NOTE—This cause was submitted at the January, 1896, term. At that time two of the Justices, (Dale, C. J., and Bierer, J.) were disqualified to sit. The remaining three Justices, (Burford J., Scott, J., and McAtee, J.,) were unable to concur. This opinion by Burford, J., expressing his individual views, was delivered February 13, 1896, and the judgment of the district court affirmed, by reason that there was no quorum to reverse. Afterwards a rehearing was granted. The cause was resubmitted at the June, 1898, term, at which all of the Justices were qualified to sit, (except Hainer, J., who was of counsel,) and the opinion of Feb. 13, 1896, modified and adopted. Opinion by Burwell, J.; Burford, C. J., and Irwin, J., concurring; McAtee, J., dissenting.—REPORTER.]

congress to hear and determine all questions of fact arising between conflicting claimants to public lands, and, when such questions are finally decided by the officers of that department, the decision is conclusive everywhere else, as regards all questions of fact. Where fraud or imposition has been practiced on the party inter-ested, or the officers of the law, or where these latter have clearly mistaken the law applicable to the facts, courts of equity may grant relief; but they are not authorized to re-examine into a mere question of fact, dependent on conflicting evidence, and to review the weight which those officers attached to such evidence.

**2.** SAME—*When Equity Will Interfere.* Equity will interfere whenever it is clear that the land officers have, by mistake of the law, given to one man the land which, on the undisputed facts, belonged to another.

**3.** SAME—*Questions of Fact—Fraud.* It is only when fraud, perjury or imposition has prevented the unsuccessful party from fully prose-cuting his case, or the officers from fully considering it, that a court of equity will re-examine and pass upon the questions of fact. It is not enough that fraud and imposition has been prac-ticed on the department. It must appear that they affected its determination, which otherwise would have been in his favor. There can be no imposition where both parties have had a full and free opportunity to be heard, with knowledge of the acts consti-tuting the alleged fraud, perjury or imposition.

**4.** LAND DEPARTMENT — *Erroneous Rulings — Remedy.* To charge the holder of the legal title, to lands under a patent of the United States as a trustee of another, and to compel him to transfer the title, the claimant must present such a case as will show that he himself was entitled to the patent from the government, and that, in consequence of erroneous rulings of the officers of the land department upon the law applicable to the facts found, it was refused him.

**5.** LAND DECISION — *Evidence Reviewed — Court of Equity.* When the petition sets out all the evidence taken before the land department, the decision of the register and receiver, and of the superior offi-cers on appeal, and contains the allegation that the final decision of the secretary of the interior, adverse to the claimant, had no evidence or facts of any character for its basis, but that such decision was rendered without any evidences or circumstances

Paine v. Foster *et al.*

whatever to warrant the same, a court of equity will review the evidence suffic'ently to determine the quest on as to whether there was any evidence tending to support the secretary's conclusions, or from which a reasonable inference could be properly drawn, warranting his findings. If there is any evidence, however slight, tending to support the conclusion of the secretary of the interior in a controverted land case, or if there are facts and circumstances detailed in evidence from which such conclusions may be reasonably and rationally inferred, then such conclusions become final and the courts will not review the weight of the evidence.

6. PLEADING—*Petition—Demurrer—Error.* When the petition is accompanied by all the pleadings and evidence in the land department, and alleges that there is no evidence whatever in support of the finding and decision of the secretary of the interior, and the record discloses the fact that there was some evidence tending to support such finding, then it is not error to sustain a demurrer to such petition on the ground that it does not state facts suffic ent to constitute a cause of action.

7. SECRETARY OF THE INTERIOR—*Land Department.* The secretary of the interior is by law given supervision of the entire business of the land department, and he is invested with authority to review, reverse, amend, or affirm all proceedings in the department having for their ultimate object to secure the alienation of any portion of the public lands. This power of supervision may be exercised by the secretary, by direct orders, or by review on appeal, or on his own motion. It is his duty to exercise it whenever matters are brought to his attention which demand the exercise of such supervision.

8. PUBLIC LAND—*Applicant for—Good Faith.* The good faith of an applicant for public land under the land laws of the United States is an element affecting his right to acquire title to the same, and is always a proper subject of inquiry and determination. It is in issue at every step required to be taken, and is to be determined from his acts, knowledge, conduct, and surrounding circumstances at the time, prior to and subsequent to making settlement or entry.

9. TOWNSITE TRUSTEES—*Duties of—Homestead Claimant.* Townsite trustees appointed under authority of the act of congress of May 14, 1890, relating to townsites in Oklahoma, hold the title to the lands in

trust both for the government and for the several occupants, and cannot dispose of the land, except for the purposes and to the uses provided by the statute. They have no interest in the land, and all the occupants of lots are necessary parties defendant in a proceeding in equity to charge them as trustees for a homestead claimant who has been defeated in the land department.

10. ACTION IN EQUITY—*Necessary Parties.* Courts of equity " delight to do justice, and not by halves;" and it is a general rule in equity that all persons materially interested, either legally or benefic ally, in the subject-matter of a suit, are required to be made parties, either plaintiff or defendant, however numerous they may be, so that there may be a complete decree, which should bind them all.

(Syllabus by the Court.)

*Appeal from the District Court of Logan County; before E. B. Green, District Judge.*

*Dale & Bierer* and *J. H. Cotteral,* for appellant.

*Horace Speed* and *Bayard T. Hainer,* for appellees.

Action by Veeder B. Paine against John Foster and others, trustees of townsite board No. 6. From a decree for defendants, plaintiff brings error. Affirmed by division of court.

Opinion by

BURFORD, J.: The court having been unable to reach a conclusion in this case, I desire to place of record my individual views on the questions involved.

This is a suit in equity to have the defendants declared trustees for the plaintiff in error. The action grows out of the complications arising from the early settlement of a portion of the townsite of Guthrie. It would appear from the record in the case that on the 22d day of April,

1889, Veeder B. Paine was in the Iowa reservation, about ten or eleven miles east of the townsite of Guthrie, and that at 12 o'clock, noon, of said day, he rode on horseback to the tract of land in question, and claims to have made settlement upon the southwest quarter of section 9, township 16 north, of range 2 west, in Logan county, Territory of Oklahoma, for the purpose of making homestead entry of the said tract under the homestead laws of the United States; that shortly after 12 o'clock of said day a number of persons attempted to settle upon said tract, and selected the same for a portion of a townsite. It further appears that on the east half of section 8, adjoining section 9 on the west, was located Guthrie station, on the line of the Atchison, Topeka & Santa Fe railway, and also the United States land office for the Guthrie land district; that the east half of section 8 was selected, surveyed, platted, and settled immediately after the opening of said country to settlement as the townsite of Guthrie; that the west half of section 9, which embraces the tract in controversy, was also selected, platted, settled, and improved as the townsite of East Guthrie; that within a few days after settlement of the townsite the townsite settlers, through an authorized agent, made an application to the local land office to enter the west half of section 9, for a townsite; that Paine made application to enter the southwest quarter of section 9, for a homestead. Some other applications were made by adverse claimants to the tract for homestead purposes. These several applications were held to await the final determination of the question as to who was entitled to the tract under the land laws of the United States.

The commissioner of the general land office directed a hearing to be had before the local land office, in which the townsite claimants were to be made plaintiffs, and the several agricultural claimants defendants, and directed that the qualification of the several homestead claimants be inquired into, and directed the townsite claimants to show when said land was first actually selected and occupied as a townsite, and the number of inhabitants, character and value of all municipal improvements thereon before and at the date of filing their application and the date of hearing, and to determine whether the homestead claimants had established settlements on the land they were seeking to enter, and the dates thereof. A hearing was had before the register and receiver of the Guthrie land office, and a vast amount of testimony submitted by the several claimants.    Subsequently the register and receiver rendered a decision in favor of the townsite settlers, and adverse to Paine.  Paine appealed from this decision to the commissioner of the general land office, who reversed the finding of the register and receiver, and held that Paine was the prior settler upon said land, and that he had complied with the requirements of the homestead laws, and was entitled to the entry upon said land.  From this decision the townsite settlers appealed to the secretary of the interior, and the secretary found in favor of the townsite settlers, and against the claims of Paine; holding that Paine's settlement was not made in good faith for homestead purposes, but was made for speculation.  Paine filed his motion for review before the secretary of the interior, which motion was subsequently overruled.  Afterwards the defendants, as townsite trustees under the act of congress of May 14,

1890, were allowed to enter the tract in question, together with other lands, for townsite purposes, for the use and benefits of the occupants thereof, and were by the rules of the department directed to proceed to convey the several lots embraced in said tract to the several occupants thereof. as their interests might appear. Subsequently a patent was issued to said trustees, conveying said tract to them in trust for the use of the townsite occupants.

On the 4th day of February, 1892, subsequent to the time the patent had issued as aforesaid, Veeder B. Paine filed in the district court of Logan county his petition alleging that the defendants, Foster, Robertson, and Schnell, were the duly appointed, qualified, and acting trustees of townsite board No. 6, and as such held the legal title and patent to the southwest quarter of section 9, township 16 north, of range 2 west, in Logan county, Territory of Oklahoma, and that the plaintiff was the equitable owner and entitled to receive the legal title to said tract of land; that he based his claim thereto on his prior settlement upon said land on April 22, 1889. It is further alleged in the petition that a contest had been instituted at the United States land office at Guthrie, to determine the respective rights of himself and the other claimants to said tract, and the decision of the local land office was adverse to him; that an appeal was taken to the commissioner of the general land office, who reversed the local office, and decided in his favor, awarding him the land; that an appeal was then taken from this decision to the secretary of the interior, who reversed the commissioner, and awarded the land to the townsite settlers; that the decision of the secretary of

the interior against him was upon the theory that his set-
tlement upon said land was not in good faith, but that
he had settled upon the land for speculative purposes, for
the purpose of entering it under the homestead laws, and
then selling it out to the townsite claimants. He further
alleges that there was no evidence whatever in the record,
and none before the secretary of the interior in any way
tending to show, either directly or indirectly, that he
took said land for speculative purposes; that the finding
of the secretary of the interior was not upon any contro-
verted fact, or upon any question in issue, either by the
pleadings or the evidence, between said Paine and the
townsite claimants. He also alleges an imposition prac-
ticed upon the secretary of the interior, by and through
one Horace Speed, who he alleges was not an attorney in
said cause, but who had a great personal influence with
the secretary of the interior, and who filed a brief in said
cause with the secretary of the interior, without having
given notice to said Paine's attorney. He further alleges
that the finding of the secretary was made from Speed's
brief, and not from the evidence, and that the finding of
the secretary that his homestead settlement was not made
in good faith for agricultural purposes was error of law,
for the reason that there was no evidence whatever in
said record upon which to base said conclusion. And he
asks that the court correct these mistakes, and award
him the land, and decree that Foster, Robertson, and
Schnell, as trustees, hold the legal title to said land in
trust for his use and benefit, and that they be required
to convey the land to him.

The petition is quite lengthy, and has attached to it,
as proper exhibits, a copy of all the testimony taken in

the land office in the hearing had before the honorable register and receiver; the order of the commissioner of the general land office, directing a hearing to be had; a copy of a decision of the register and receiver; a copy of the opinion rendered by the commissioner of the general land office, and also a copy of the decision rendered by the secretary of the interior; and several other documents pertaining to said original cause.

To the petition the defendants demurred upon five different grounds, to-wit: First, the court has no jurisdiction of the defendants; second, that the court has no jurisdiction of the subject-matter of the action; third, that there is a defect of parties defendant, in this: that the several lot owners and lot claimants in and to the southwest quarter of section 9, township 16, north of range 2 west, should be made parties defendant; fourth, that the complaint does not state facts sufficient to constitute a cause of action; fifth, that several causes of action are improperly joined.

On the 30th day of September, 1892, the district court sustained the demurrer to the complaint, to which the plaintiff excepted, and stood on his complaint; and the court rendered judgment against him, from which he now appeals.

The question presented to this court for consideration is whether or not the district court erred in sustaining the demurrer to plaintiff's petition. It is contended by the defendants in error that the conclusions and findings of the secretary of the interior on the questions of fact involved in

the controversy are conclusive, and that a court of equity will not review the evidence in order to determine the correctness of such findings and conclusions. Upon the other hand, it is contended by the plaintiff in error: First, that a court of equity will review the evidence submitted to the secretary, in order to determine whether or not he has awarded the land to the person to whom, under the law, the same should go; secondly, that as it is alleged that the decision of the secretary, upon which he denied the plaintiff's right to enter the land in question, was favorable to him upon the question of his prior settlement, his residence, and improvements, and adverse to him upon only the one ground that he had not taken the land in good faith for homestead purposes, but for the purpose of speculation, and there being absolutely no evidence whatever in the record upon which said findings or conclusions could be based, in such a case the court will loook into the evidence sufficiently to determine whether or not there was any evidence upon which said findings and conclusions could be based.

As to the first proposition, it would seem from some of the reported cases, that the court has reviewed the questions of fact involved therein, and passed upon the same; but a critical examination of such cases discloses the fact that the court reviewed only uncontroverted facts, in order to determine whether there had been a proper application of the law by the departmental officers. The courts have always, in proper cases, interceded to correct mistakes of law, and, without attempting to take from the department the right to determine controverted or disputed questions of fact, have, when

two or more claimants to public lands based their claims
upon certain given facts, upon which there was no sub-
stantial controversy, after title had passed to one of the
parties, examined into such facts for the purpose of cor-
recting errors of law committed by the officers of the
land department, if any were found to exist; but it has
not been the policy or practice of the courts generally to
interfere with the findings or conclusions of the officers
of the land department, made upon disputed or contro-
verted questions of fact, either at law or in equity.
There may be found some exceptions to this rule, but
such exceptions are not sustained by the weight of
authority.

In the case of *Johnson v. Towsley*, 13 Wall. 84, the
question as to how far courts of equity have the power
to inquire into and correct mistakes in judicial and
executive action, when such action invades private
rights, was before the supreme court of the United States
for consideration.    Mr. Justice Miller, speaking for the
court, said:

" That the action of the land office in issuing a patent
for any of the public lands subject to sale by preemption
or otherwise is conclusive of the legal title, must be
admitted, under the principle above stated; and in all
courts, and in all forms of judicial proceedings, where
this title must control, either by reason of the limited
powers of the court, or the essential character of the
proceeding, no inquiry can be permitted into the circum-
stances under which it was obtained. On the other hand,
there has always existed in the courts of equity the
power, in certain classes of cases, to inquire into and cor-
rect mistakes, injustice, and wrong in both judicial and

executive action, however solemn the form which the result of that action may assume, when it invades private rights; and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the crown or other executive branch of the government have been corrected or declared void, or other relief granted. No reason is perceived why the action of the land office should constitute an exception to this principle."

Further, speaking of the class of actions in which the courts had reviewed the action of the department, it was said:

"Undoubtedly, there has been in all of them some special ground for the exercise of the equitable jurisdiction; for this court does not, and never has, asserted that all the matters passed upon by the land office are open to review in the courts. On the contrary, it is fully conceded that when those officers decide controverted questions of fact, in the absence of fraud or imposition or mistake, their decision on these questions is final, except as they may be reversed on appeal in that department. But we are not prepared to concede that when, in the application of the facts as found by them, they, by misconstruction of the law, take from a party that to which he has acquired a legal right under the sanction of those laws, the courts are without power to give any relief."

In the case of *Shepley v. Cowan*, 91 U. S. 330, which was a suit in equity to settle the conflicting claims of the parties arising from conflicting patents to the same tract of land, the court, speaking by Mr. Justice Field, said:

"If the matter were open for our consideration, we might perhaps doubt as to the sufficiency of the proofs

presented by the heirs of Chartrand to the officers of the department to establish a right of pre-emption by virtue of the settlements and proceedings of their ancestor, or by virtue of their own settlement.    Those proofs were, however, considered sufficient by the register of the local land office, by the commissioner of the general land office on appeal from the register, and by the secretary of the interior on appeal from the commissioner.    There is no evidence of any fraud or imposition practiced upon them, or that they erred in the construction of the law applicable to the case.    It is only contended that they erred in their deductions from the proofs presented; and for errors of that kind, where the parties interested had notice of the proceedings before the land department, and were permitted to contest the same, as in the present case, the courts can furnish no remedy.    The officers of the land department are specially designated by law to receive, consider, and pass upon proofs presented with respect to settlements upon the public lands.    If they err in the construction of the law applicable to any case, or if fraud is practiced up m them, or they themselves are chargeable with fraudulent practices, their rulings may be reviewed and annulled by the courts when a controversy arises between private parties founded upon their decisions; but for mere errors of judgment upon the weight of evidence in a contested case before them the only remedy is by appeal from one officer to another of the department, and, perhaps, under special circumstances, to the president.    It may also be, and probably is, true that the courts may furnish, in proper cases, relief to a party, where new evidence is discovered, which, if possessed and presented at the time, would have changed the action of the land officers; but, except in such cases, the ruling of the department on disputed questions of fact, made in a contested case, must be taken, when that ruling is collaterally assailed, as conclusive.    In this case, therefore, we cannot inquire into the correctness of the ruling of the land department

upon the evidence presented of the settlement of Chart-rand, the ancestor, or of his heirs."

In the case of *Moore v. Robbins*, 96 U. S. 530, Mr. Justice Miller, speaking for the court, said "that the decision of the officers of the land department, made within the scope of their authority, on quesions of this kind, is, in general, conclusive everywhere, except when reconsidered, by way of appeal, within that department, and that as to the facts upon which their decision is based, in the absence of fraud or mistake, that desisi in is conclusive even in courts of justice, when the title afterwards comes in question, but that in this class of cases, as in all others, there exists in the courts 'of equity the jurisdiction to correct mistakes, to relieve against frauds and impositions, and in cases where it is clear that those officers have, by mistake of the law, given to one man the land which on the undisputed facts belonged to another, to give appropriate relief." In this case it was held that the land department had misapplied the law, and had given to one man land which, on the undisputed facts, belonged to another.

In the case of *Marquez v. Frisbie*, 101 U. S. 473, which was a suit in equity, wherein it was claimed that the decision of the department of the interior against Marquez, and in favor of Frisbie, *et al.*, to a certain quarter section of land, was erroneous, and praying a judgment of the court decreeing him to be its true owner, and his right to the legal title paramount.

Mr. Justice Miller quoted approvingly the principle announced in *Moore v. Robbins, supra*, and said further:

"The language of this court in *Moore v. Robbins*, cited above, is that equity will interfere when it is clear that

these officers have, by mistake of the law, given to one man the land which on the undisputed facts, belonged to another. The meaning of this, and the sound principle, is, that where it is a mixed question of law and fact, and when the court cannot so separate them as to see clearly where the mistake of law is, the decision of the tribunal to which the law has confided the matter is conclusive; but if it can be made entirely plain to a court of equity that on facts about which there is no dispute, or no reasonable doubt, those officers have, by a mistake of law, deprived a man of his right, it will give relief."

Applying this rule to the case at bar, it would seem that the contention of counsel for plaintiff in error is correct; that is, that if there is no dispute or no reasonable doubt as to the allegation in plaintiff's complaint that there was no testimony whatever, or any evidence, from which it could be reasonably inferred that Paine did not, as found by the secretary of the interior, take the tract of land in dispute in good faith for homestead purposes, but for speculative purposes, a court of equity could and should grant him relief; but, on the other hand, under the same rule, if there is any evidence which tends, in any degree, however slight, to support the conclusions of the secretary as announced in his opinion, then such conclusions become final, and a court of equity will not interfere.

In the case of *Vance v. Burbank*, 101 U. S. 514, which was a suit in equity to determine the conflicting claims of the several parties to a tract of land obtained from the government, Mr. Chief Justice Waite delivered the opinion of the court, and, in discussing that portion of the case which seems to be applicable to the case at bar, said:

"So far as this suit depends on the original title of Lemuel Scott, it is clear, under the well settled rules of decision in this court, that there can be no recovery. The question in dispute is one of fact; that is to say, whether Scott, when he demanded his patent certified as against the other contesting claimants, has resided on and cultivated the land in dispute for four consecutive years, and had otherwise conformed to the requirements of the donation act. This was to be determined by the land department, and, as there was a contest, the contending parties were called on, in the usual way, to make their proofs. They appeared, and full opportunity was given Scott to be heard. He presented his evidence, and was beaten, and having taken the case through, by successive stages, on appeal, to the secretary of the interior, this, in the absence of fraud, is conclusive on all questions of fact. We have many times so decided. The appropriate officers of the land department have been constituted a special tribunal to decide such questions, and their decisions are final to the same extent that those of other judicial or *quasi* judicial tribunals are. It has also been settled that the fraud in respect to which relief will be granted in this class of cases must be such as has been practiced on the unsuccessful party, and prevented him from exhibiting his case fully to the department, so that it may properly be said there has been a decision in a real contest about the subject matter of inquiry. False testimony or forged documents, even, are not enough, if the disputed matter has actually been presented to, or considered by, the appropriate tribunal. The decision of the proper officers of the department is in the nature of a judicial determination of a matter in dispute."

In *Quinby v. Conlan*, 104 U. S. 420, which was an action for the possession of real estate, the defendant denied the allegation to the complaint, and set up by way

of cross-complaint an equitable defense to the action, and alleged that he was the equitable owner of the premises, and that the plaintiff held the legal title for him, and asked for affirmative relief. In discussing the power of the officers of the land department over questions of fact affecting public lands, Mr. Justice Field, speaking for the court, said:

"But, independently of this conclusion, there is a general answer to the alleged erroneous rulings of the officers of the land department as grounds for the interference of the court. These rulings were upon mere matter of fact, or upon mixed questions of law and fact, which were properly cognizable and determinable by the officers of that department. The laws of the United States prescribe with particularity the manner in which portions of the public domain may be acquired by settlers. They require personal settlement upon the lands desired, and their inhabitation and improvement, and a declaration of the settler's acts and purposes to be made in the proper office of the district within a limited time after the public surveys are extended over the lands. By them a land department has been created, to supervise all the various steps required for the acquisition of the title of the government. Its officers are required to receive, consider, and pass upon the proofs furnished as to the alleged settlements upon the lands, and their improvements, when pre-emption rights are claimed, and, in case of conflicting claim to the same tract, to hear the contesting parties. The proofs offered in compliance with the law are to be presented, in the first instance, to the officers of the district where the land is situated; and from their decision an appeal lies to the commissioner of the general land office, and from him to the secretary of the interior. For mere errors of judgment as to the weight of evidence on these subjects by any of the subordinate officers, the only remedy is by an appeal to his superior of the de-

partment.  The courts cannot exercise any direct appellate jurisdiction over the rulings of those officers, or of their superiors in the department, in such matters; nor can they reverse or correct them in a collateral proceeding between private parties.  In this case the allegation that false and fraudulent representations as to the settlement of the plaintiff were made to the officers of the land department is negatived by the finding of the court. It would lead to endless litigation, and be fruitful of evil, if a supervisory power were vested in the courts over the action of the numerous officers of the land department on mere questions of fact presented for their determination.  It is only when those officers have misconstrued the law applicable to the case as established before the department, and thus have denied to parties rights which upon a correct construction would have been conceded to them, or where misrepresentation and fraud have been practiced, necessarily affecting their judgment, that the courts can, in a proper proceeding, interfere, and refuse to give effect to the action.  On this subject we have repeatedly, and with emphasis, expressed our opinion, and the matter should be deemed settled.  And we may also add, in this connection, that the misconstruction of the law by the officers of the department which will authorize the interference of the court must be clearly manifest, and not alleged upon a possible finding of the facts, from the evidence, different from that reached by them.   And, where fraud and misrepresentations are relied upon as grounds of interference by the court, they should be stated with such fullness and particularity as to show that they must necessarily have affected the action of the officers of the department.   Mere general allegations of fraud and misrepresentations will not suffice."

In the case of *Steel v. Smelting Co.*, 106 U. S. 447, 1 Sup. Ct. 389, Mr. Justice Field very appropriately said:

"We have so often had occasion to speak of the land department, the object of its creation,

and the powers it possesses in the alienation, by patent, of portions of public lands, that it creates an unpleasant surprise to find that counsel, in discussing the effect to be given to the action of that department, overlooked our decisions on the subject. That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see that the requirements of different acts of congress are fully complied with. Necessarily, therefore, it must consider and pass upon the qualifications of the applicant, the acts he has performed to secure the title, the nature of the land, and whether it is of the class which is open for sale. Its judgment upon these matters is that of a special tribunal, and is unassailable, except by direct proceedings for its annulment or limitation. Such has been the uniform language of this court in repeated decisions."

In *Baldwin v. Starks*, 107, U. S. 463, 2 Sup. Ct 473, the supreme court of the state of Nebraska had reviewed the evidence upon which the commissioner of the land office and the secretary of the interior had decided certain conflicting claims to a tract of land, and had reversed their decision on the evidence. In reviewing this action, Mr. Justice Miller, speaking for the court said:

"That record shows that upon all the questions involved the department decided in favor of Starks, except one, which was that he was disqualified to make the pre-emption claim he was then prosecuting, by reason of having previously exercised that right in regard to other lands. Whether he had thus made a filing of a former declaratory statement was a question of fact much contested before the department, in regard to which Starks himself was sworn, as were also several other witnesses, and the record of the alleged filing was also produced. On all this evidence the commissioner of the general land

office decided that he had filed the previous declaration, and was therefore disqualified as a pre-emptor of the land now in controversy. On appeal to the secretary of the interior, this decision was affirmed, and Starks' claim was rejected, and Van Pelt's allowed, and the patent issued to him. The supreme court of Nebraska holds that the land department decided this question of fact erroneously, and that Starks never filed or made the former declaratory statement, that he was a qualified pre-emptor for the land patented to Van Pelt, and decrees a conveyance to him by Baldwin of the legal title vested by the patent. It has been so repeatedly decided in this court, in cases of this character, that the land department is the tribunal appointed by congress to decide questions like this, and when finally decided by the officers of that department the decision is conclusive everywhere else as regards all questions of fact, that it is useless to consider the point further. Where fraud or imposition has been practiced on the party interested, or on the officers of the law, or where these latter have clearly mistaken the law of the case, as applicable to the facts, courts of equity may give relief; but they are not authorized to reexamine into a mere question of fact, dependent on conflicting evidence, and to review the weight which those officers attached to such evidence."

In *Bohall v. Dilla*, 114, U. S. 47, 5 Sup. Ct. 782, which was an action to recover the possession of real estate, in which the defendant set up, by way of cross-complaint, that he was the equitable owner of the premises, and the plaintiff held the title in trust for him, and asked that he be required to convey the same to him, Mr. Justice Field said:

"To charge the holder of the legal title to lands under a patent of the United States as a trustee of another, and to compel him to transfer the title, the claimant must present such a case as will show that he himself was en-

titled to the patent from the government, and that, in consequence of erroneous rulings of the officers of the land department upon the law applicable to the facts found, it was refused to him. It is not sufficient to show that there may have been error in adjudging the title to the patentee. It must appear that by the law, properly administered, the title should have been awarded to the claimant."

In *Lee v. Johnson*, 116 U. S. 48, 6 Sup. Ct. 249, which was a suit in equity to have the holder of a patent of public land declared a trustee for the benefit of the plaintiff, on the ground that the patent was improperly issued, Mr. Justice Field said:

"The defendant in the court below, (the plaintiff in error here,) is the holder of a patent of the United States for a parcel of land in Michigan, issued to him under the homestead laws; and the present suit was brought to charge him as trustee of the property, and compel a conveyance to the plaintiff. The patent having been issued by officers of the land department, to whose supervision and control are entrusted the various proceedings required for the alienation of public lands, all reasonable presumptions are indulged in support of their action. It cannot be attacked collaterally, but only by direct proceedings instituted by the government, or by the parties acting in its name and by its authority. If, however, those officers mistake the law applicable to the facts, or misconstrue the statutes, and issue a patent to one not entitled to it, the party wronged can resort to a court of equity to correct the mistake, and compel the transfer of the legal title to him, as the true owner. The court in such a case merely directs that to be done which those officers would have done if no error of law had been committed. The court does not interfere with the title of a pantentee, when the alleged mistake relates to a matter of fact, concerning which those officers may have drawn wrong conclusions from the testimony. A judicial in-

quiry as to the correctness of such conclusions would en-, croach upon a jurisdiction which congress has devolved exclusively upon the department. It is only when fraud and imposition have prevented the unsuccessful party in a contest from fully presenting his case, or the officers from fully considering it, that a court will look into the evidence. It is not enough, however, that fraud and imposition have been practiced upon the department, or that false testimony or fraudulent documents have been presented. It must appear that they affected its determination, which otherwise would have been in favor of the plaintiff. He must in all cases show that, but for the error or fraud or imposition of which he complains, he would be entitled to the patent. It is not enough to show that it should not have been issued to the patentee. It is for the party whose rights are alleged to have been disregarded that relief is sought, not for the government, which can file its own bill when it desires the cancellation of a patent unadvisedly or wrongfully issued."

Again, in the same opinion, it is said:

"Without going into any detail of the evidence presented to the commissioner ,and the secretary of the interior, but taking the general statement of its nature which we have given, it is clear that their attention was drawn by it to the character of the settlement of Johnson, and that they considered whether his entry was made to acquire a home for himself, or for his son-in-law; whether his residence had been sufficiently personal and continuous to save and perfect any right, if in fact he had ever initiated any; and whether or not he had abandoned the land. The findings of the secretary upon any of these matters of fact cognizable by it has been expressly affirmed. * * To allow the conclusions of the secretary of the interior on questions of fact to be subjected to review in cases of this kind would open the door to endless litigation."

From the principles announced in the foregoing authorities, there would seem to be no question as to the rule that findings and conclusions upon controverted questions of fact properly before the officers of the land department for their consideration are final and conclusive.

As to the second contention of counsel for plaintiff in error, that upon their allegation that the record presented to the secretary of the interior contained no evidence whatever upon which a finding of fact could be based, or an inference of fact properly drawn, to the effect that Paine had not taken the tract in good faith for agricultural purposes, but for the purposes of speculation, there may be some room for doubt.   While the case presented seems to be without precedent, yet, upon principle, it would seem that if the secretary of the interior should so far forget the obligations and important duties imposed upon him by his high office as to render a decision, involving valuable rights and important questions, without any evidence whatever to base such decision or conclusion upon, a court of equity, under a proper presentation of such matters, would have the power, and it would be its duty, to grant relief.   Where such a case as is made by the allegations of the complaint in this case is presented to a court of equity, we see no good reason why the court should not so far review the record and testimony taken in the land office, and made a part of the complaint, as to determine whether or not such record contains any evidence whatever tending to support the findings and conclusions complained of, and, if such record should be found to contain no proof whatever tending to suport the findings and conclusions of the secretary, that the court should grant such relief as

the equities of the case might demand. But, as in the case under consideration, if an examination of the record should disclose the fact that any evidence was presented to the secretary, however slight, from which his findings or conclusions could be reasonably inferred, then the complaint would be insufficient to present a case for equitable relief, and it would not be error to sustain a demurrer to the same. That portion of the decision of the secretary of the interior which relates to the questions in this case is as follows:

"The Townsite company of East Guthrie made application to enter the west half of section 9, as a townsite, and Veeder B. Paine made application to enter the southwest quarter of section 9 as a homestead, and Xenophon Fitzgerald made application to enter the northwest quarter of said section 9 as a homestead. Your office rejected the application of the company, and awarded the land to Paine and Fitzgerald, and the townsite company appeal. Both Paine and Fitzgerald allege that they left the border line of Oklahoma Territory after 12 o'clock, noon, on April 22, 1889, and that they made settlement on their respective claims before settlement was made thereon by the townsite claimants. A great mass of conflicting testimony was taken on this point, but, after a careful consideration of the same, I am of the opinion that both Paine and Fitzgerald reached the respective tracts before any of the townsite claimants, who entered the Territory after 12 o'clock, noon, had settled upon said tracts; and the question arises, were these alleged homestead settlements made in good faith for the purposes contemplated in the homestead law, or were they made for speculative puropses? Counsel for the homestead claimants truly say: 'If Paine and Fitzgerald were prior in time of legitimate settlement, their right to the land in beyond discussion, and it is idle to

plead matter of aggravation. If they were not the first among the lawful settlers, they have no right under their claims. This is the gist of the case.'

"It is unnecessary to discuss at length the purposes of the homestead law. They are too well known. For nearly thirty years, under the provisions of this act, thousands upon thousands of the best citizens of our land have established homes for themselves and their families on the public domain, have reclaimed and cultivated millions of acres, and the wealth and the power of the nation have been increased. The object of the law was to procure the settlement and development of the unappropriated agricultural lands of the country. For this reason, not only lands included within the limits of an incorporated town, but lands selected as the site of a city or town, were excluded from the operation of said law. It is true that in numerous instances the lands that were entered as homes for agricultural purposes have become the sites of large towns, but that did not change the fact that the lands were entered in good faith under the provisions of the law. The uniform practice of the land department has been to resist the efforts of those who have attempted, under said act, to obtain title to the public domain for other than agricultural purposes. In the case under consideration, we find that in the proclamation of the president of the United States issued March 23, 1889, one acre of the northwest quarter of section 9 had been reserved for government use and control, and by the order of the president, dated March 25, 1889, a land office was established at or near Guthrie, which was the railroad station located on section 8, adjoining the land in dispute. Every intelligent person is aware of the fact that for the last half century the establishment of a United States government land office was equivalent to the foundation of a town or city of greater or less magnitude. Wherever a spot was selected for a land office, that spot became the center of population—it became a town; and the land ceased to be in a

condition where it could be used for agriculture, but it became valuable for townsite purposes. Of all the thousands of eager, active, intelligent men who had collected on the borders of Oklahoma prior to 12 o'clock, noon, on April 22, 1889, there was hardly one who was ignorant of the fact that a government land office had been established at Guthrie, and of the resulting fact that a town would be established there, and already predictions of its future greatness as the capital of the Territory had been indulged in. The waiting crowds knew all these facts, and they knew that the land in controversy must be used for the homes, the business, and the trade of the people who would compose the population of this coming town. It is true, there had been no reservation of the tract by the president for townsite purposes, but his official acts had given notice to the world of the fact that the lands would be used for purposes other than agricultural. Veeder B. Paine knew all these facts. The evidence shows that he was a man possessed of intelligence and energy. He planned ingeniously to reach this land before any one else who left the border at the hour designated to do so. Two of his friends left during the morning, for Guthrie, for the purpose of taking the train. The vehicle which carried them to this point also transported the camping outfit, provisions, an ax, and the coat of Paine. Another friend, who desired to go to Guthrie to take the train, started a little later, on horseback, over the road which would be traveled by Paine. It may be true that the departure of these men at this time was merely incidental—an accident of their ordinary business life. But, however this may be, their acts of kindness rendered assistance to their friend Paine. In the meantime Paine was on the border of the Territory, waiting for the moment to start. He was mounted on a fleet horse, possessed of great powers of endurance. When the signal was given, the waiting crowd, consisting of hund-

reds of people, started; and Paine, thus unencumbered by his camping outfit, provisions, coat, etc., so necessary to a person who was to make a settlement on the uninhabited plains, found that the confidence reposed in his horse had not been misplaced, for from the very start he took the lead, and was soon out of sight of all others. Soon after leaving the border, one of the saddle girths was broken, but the rider continued his rapid journey. He took no note of the many unappropriated tracts of agricultural lands over which he passed—tracts whereon he could have established a home as contemplated by the homestead law. He was only eager to reach the land in dispute. After riding about eight miles, he overtook the friend who had preceded him on horseback. He had dismounted, and his horse was standing by the roadside, eating grass. The friend saw the broken saddle girth, and suggested an exchange of horses, which suggestion was instantly accepted, and Paine pursued his journey to the desired tract, where one of his friends, who had preceded him on the wagon containing his e_ects, the ax, etc., was found; also, a piece of board, from which he made stakes with the ax, and drove them into the ground, marking thereon his name, and the fact that he claimed the same as his homestead. He blazed a tree situated on the land, and made a similar notation, and thus he made settlement on what he alleges was a tract he intended for his homestead under the provisions of the homestead law. It cannot be denied that the friends who entered the Territory prior to the hour fixed in the proclamation of the president rendered Paine valuable and material assistance. It is denied by both Paine and his friend that the exchange of horses was made in pursuance of any prior arrangement, but that it was only incidental, resulting from the breaking of the saddle girth; but no explanation is given why the friend was waiting by the roadside with a horse that had become

at least partially rested, nor, if Paine's horse was still fresh, why horses were exchanged, instead of saddles. Whether previously intended or not, there was, in enect, a relay of horses; and this relay was made possible by one of his friends entering the Territory prior to the hour fixed by the proclamation. The assistance rendered by friends gave Paine an advantage over others, and this advantage was gained by unlawful means, inasmuch as the aid was rendered by parties who entered the Territory prior to 12 o'clock, noon. Taking the whole history of this case into consideration, I am unable to arrive at the conclusion that Paine, either in the conception or execution of his settlement on his land, acted in good faith, as a *bona fide* claimant under the homestead law; and, in the absence of good faith, no claim can be recognized. All the facts indicate that the claim was taken for speculative purposes only—to enable him to dispose of this land for townsite purposes—and that it was not taken for agricultural purposes, and for the purpose of a home, or at least for a home as contemplated by the homestead law. Paine asserts that he was aware on the morning of April 22, that the land office was to be placed on section 8; that is, a few hundred feet from the acre reserved in the president's proclamation for government use. But this incident in no way changed the fact as to the location of the townsite, and Paine, as an intelligent man, knew that such was the case.

" Counsel cite the decision of my predecessor in the case of *Plummer v. Jackman*, 10 Copp. Landowner, 71, and quote the following remarks: ' The statute cannot be construed to mean that persons going to the frontiers, or along the lines of projected railways, and anticipating centers of population, shall not enjoy the benefits of their enterprise and foresight, though they believe that their claims would become of great value on account of their proximity to cities and villages, or that villages or

cities would even be built upon such claims, and thereby enable them ultimately to realize large prices for such lands.' No rule could be more just, as applied in the case then under consideration, and in similar cases. But how different the facts in the case cited, and the one now under consideration! In the former the claimant had travelled for hundreds of miles across an uninhabited prairie, far in advance of settlements and civilization, and selected a tract of wild land for settlement and cultivation. He may have anticipated that at some future day a railroad might cross a great river in that vicinity, and that a town might be established there in the years to come, but it was all uncertainty. Even the building of the road was not an assured fact, and the selection of a point for the crossing of the river was an unsolved problem. On the other hand, in the present case the location of the town was an assured fact, of which Paine was aware long before he started on his rapid, but short journey to reach the designated tract. He found the people with him, actuated by the same impulse, rushing for the same point, for the express purpose of occupying it for trade, commerce, and the upbuilding of a city. There could have been no uncertainty in his mind as to its immediate occupation for these purposes. The claim of Paine must be rejected, on the theory that he seeks to make his entry for speculative purposes—makes it in order that he may sell it to townsite occupants, on account of its being occupied for purposes of trade and commerce. I cannot assent to the doctrine that one who, in the manner here indicated, reached this tract a few minutes in advance of his fellows, shall be permitted to hold the advantage he has thus gained, and speculate off, and enrich himself from their misfortune, in being less fleet than he; and especially so when I am firmly convinced that he had been planning and arranging for days how he might

reach this townsite in advance of the people contemplating locating thereon, and enter it as a homestead, and then sell it to them at his own price. The land in controversy is now covered with lasting and valuable improvements, worth many thousands of dollars, and is occupied by an intelligent and thriving community, which located there, in part, within a few minutes after the arrival of Messrs. Paine and Fitzgerald; and, to my mind, it would be a very harsh, unjust and inequitable ruling, to hold that because they reached this townsite first, if they did, that they own it. They knew it was to be a townsite; they started for it as a townsite, with the intent to hold the land for that purpose, under the guise of a homestead; and now they must hold it, in common with the other inhabitants thereof, as a townsite, without levying tribute upon them for the lots which they do not own. Under all the facts and circumstances surrounding their going upon the land in controversy, they have no rights which are greater or more sacred, or which are entitled to other protection, than the rights of those who, in common with them, and with the same intent and purpose, started with them to settle upon these lands for townsite purposes. Holding these views, which the record forces me to entertain, I am unable to concur in your decision that either Paine or Fitzgerald made a *bona fide* settlement in good faith under the homestead law; and your decision, allowing their application to enter, is reversed."

It is contended by counsel for plaintiff in error that the question of the good faith of Paine, or as to whether he had taken the land for speculative purposes, was not in issue in the contest proceedings, and was not properly before the secretary, and that the secretary had no authority to pass upon and determine said question on the pleadings and evidence before him. The question of

good faith is always involved in the initiation of a right to, or acquirement of title to, public lands, whether such right be initiated by settlement or by homestead entry. One who seeks to acquire a right to public lands under the homestead laws must initiate that right either by settlement upon the lands, or by making his entry at the land office.  Either step must be taken in good faith for the purpose of acquiring title to the land for a home, and for agricultural purposes.  His good faith is a proper subject for inquiry and for determination in each step required to be taken by him in perfecting his rights or acquiring title.  It is always in issue.  This evidence of good faith, which gives vitality and validity to the homestead entry or settlement, is to be determined from the acts of the entryman prior to, at the time, and subsequent to his settlement or entry.  All the circumstances connected with the initiation of his right; the condition of the land at the time; its surroundings; its relation to other tracts used for agricultural or townsite purposes; its proximity to a townsite, or to those factors which would necessarily constitute the center of a settlement of those seeking to select lands for townsite purposes, and the probability of its being required for townsite purposes; his knowledge of the land and its surroundings prior to the initiation of his claim to the same; his manner of initiating his right; his prior preparation, and subsequent conduct; the fact of his having received or accepted aid or assistance from those who may have entered the Territory before the time prescribed in the proclamation; his use of the land, and conduct toward adverse claimants; the adaptability of the tract for agricultural purposes, as compared with

other tracts that he may have passed over in reaching the same; its location, as relating to government reservations and the United States land office; its location with reference to railroads and railroad stations—are all proper matters to be considered in determining the purpose of the party in making his settlement, and in determining his good faith. The secretary had these questions before him, and, under the law, had the right to pass upon his *bona fides*, without having the same presented to him by formal pleadings.

This question was settled in the case of *Lee v. Johnson*, 116 U. S. 48, 6 Sup. Ct. 249, in which case it was said:

"The supreme court of Michigan held the decision of the secretary of the interior inconclusive, because it was not upon a point in issue between the contestants, stating that the question was that of abandonment, which only was inquired into by the register, or could be considered on appeal; that the jurisdiction of the secretary, if he disposed of the case finally on other grounds, was not appellate, but original, and that this had not been conferred; that the register, on the hearing, and the commissioner, on appeal, had decided that the plaintiff had not abandoned the land, and upon that ground there was no reversal of the decision. It therefore held that the plaintiff was entitled to the relief prayed.   *   *   While there are no formal pleadings in such cases, it is undoubtedly true, as a general rule, that in contested matters before the land department, as in those before the courts, the decision should be confined to the questions raised by the allegations of the respective parties; but this rule has its exceptions. If in any case it appears from the evidence that the claim of the complaining or moving party is against public policy or the law, so that in no event could he recover a final judgment or

decision, whatever be the nature or extent of the testimony upon the point at issue, the tribunal should not hesitate to dismiss the suit or the proceeding. * * So, in the present case, the secretary of the interior came to the conclusion, from the evidence returned by the register, that Johnson must be considered, not as a *bona fide* homestead claimant, acting in good faith, but as one seeking, by a seeming compliance with the forms of law, to obtain a tract of land for his son-in-law, who had previously exhausted his homestead privileges; observing that the element of good faith is the essential foundation of all valid claims under the homestead law. Under these circumstances, so far from having exceeded his jurisdiction, in directing a cancellation of the entry, he was exercising only that just supervision which the law vests in him over all proceedings instituted to acquire portions of the public lands. Upon the testimony, the question of abandonment could be of no consequence, as no right in Johnson's favor had been initiated. Upon an application for rehearing, the secretary reiterated his judgment; stating that he was unable, upon the testimony of Johnson himself, to arrive at the conclusion that he had complied with the provisions of the homestead law to an extent to entitle him to its benefits."

A similar question was before the supreme court of the United States in the case of *Knight v. Association*, 142 U. S. 161, 12 Sup. Ct. 258, wherein it was contended that the commissioner of the general land office having approved and confirmed a survey of the public lands, the power became exhausted, and that the secretary of the interior had no authority to set aside the order of the commissioner in view of the fact that no appeal was taken from such order, and that the same was not properly before the secretary. The court, after referring to the various statutes prescribing the duties of the com-

missioner of the general land office and of the secretary of the interior in relation to public lands, held that the secretary had the power to reverse and review or revise any of the findings of the commissioner of the general land office, or inferior officers, whether the same came to him by appeal or on review, or whether he took the matter upon his own motion; and the court said:

"It makes no difference whether the appeal is in regular form, according to the established rules of the department, or whether the secretary, on his own motion, knowing that injustice is about to be done by some action of the commissioner, takes up the case, and disposes of it in accordance with law and justice. The secretary is the guardian of the people of the United States over the public land. The obligations of his oath of office oblige him to see that the law is carried out, and that none of the public domain is wasted, or disposed of to a party not entitled to it. He represents the government, which is a party in interest in every case involving the surveying and disposal of the public lands."

The secretary of the interior, in 5 Land Dec. Dep. Int. 494, said: "The statutes, in placing the whole business of the department under the supervision of the secretary, invest him with authority to review, reverse, amend, annul, or affirm all proceedings in the department having for their ultimate object to secure the alienation of any portion of the public lands, or the adjustment of private claims to lands, with a just regard to the rights of the public and of private parties. Such supervision may be exercised by direct orders, or by review on appeal. The mode in which the supervision shall be exercised, in the absence of statutory direction,

may be prescribed by such rules and regulations as the secretary may adopt. When proceedings affecting titles to lands are before the department the power of supervision may be exercised by the secretary, whether these proceedings are called to his attention by formal notice or appeal. It is sufficient that they are brought to his notice." This decision was quoted with approval in the case of *Knight v. Association, supra.*

It has long been the practice in the interior department, as is shown by the adjudicated cases, to determine the good faith of applicants for public lands, upon any evidence before the officers of the department, where such evidence disclosed a state of facts which would defeat the right of the claimant, although such question may not have been directly in issue in any contest proceeding. As we understand the decision of the secretary of the interior, as set forth in the exhibit to the complaint, he denies the right of Paine to make homestead entry for the tract in dispute, for the reason that he did not take the land in good faith for homestead purposes, but with the intention of holding the same under the guise of a homestead, knowing that it would be required for a townsite, and that he might speculate off of the townsite settlers. The conclusion is stated by the secretary of the interior, that he is convinced from the evidence that Paine did not take the tract in good faith for homestead purposes, as contemplated by the homestead law. If Paine did not take the land in good faith for homestead purposes, it was then immaterial for what purpose he did take it. Hence, the controlling question in this case is: Was Paine acting in good faith

in initiating his settlement, and attempting to acquire title to the land in good faith for homestead purposes? The secretary found, as a matter of fact, that he did not take the same in good faith; and the complaint alleges that there is no testimony in the record, and there was no evidence or fact whatever before the secretary, upon which to base such conclusion, and that it was therefore error of law for him to so decide. In order to determine whether or not this allegation of the complaint is well taken, it is necessary for us to review all the evidence taken in the case before the land department, and which is made a part of the complaint by exhibit. If there is any evidence, however slight, tending to sustain this finding, then such conclusion becomes conclusive. The court cannot weigh the evidence, or encroach upon the judgment of the land officers in determining controverted matters of fact. The secretary had the right to find any facts to be proven which might reasonably and rationally be inferred from the facts and circumstances detailed in evidence; and if we find any facts or circumstances, appearing as evidence, or connected with the case, upon which such inference could be reasonably based, then such inference is conclusive and final. The finding of the secretary that Paine did not take the land in good faith for a homestead is an inference of fact; and, before we can ignore that inference, we must find that it is an unreasonable or irrational inference, and one which could in no event be properly drawn from, or based upon the testimony and circumstances disclosed in the record. From the mass of testimony accompanying the petition, it appears that there was testimony tending to show that, prior to the opening of the Okla-

homa country, Paine was in Guthrie, a station on the
Atchison, Topeka & Santa Fe railroad, where the town
of Guthrie is now located, and made a casual examina-
tion of the country and its surroundings; that he pre-
pared a drawing or sketch of the lands in the vicinity of
the depot, and particularly marked the quarter section
in dispute on his plat or sketch; that the depot and rail-
road were located upon the east half of section 8, and
on low or bottom lands, which were broken and traversed
by a stream; that the tract in controversy lies less than
one-half mile from the depot, and was mostly elevated
prairie land, and better adapted for a townsite than the
land in the immediate vicintiy of the railroad and the
station; that Paine had crossed the tract of land prior
to the opening of the country for settlement, and was
familiar with the surroundings; that, by an executive
order, one acre of the tract in controversy had been re-
served for government use, and a land office had been
located on the tract west of the one in controversy, and
but a short distance from it, which was known to Paine
prior to the time that he started into the country to
make his settlement; that the tract was well adapted
for townsite purposes, and was not as eligible for agri-
cultural purposes as some other lands in the vicinity;
that Paine was employed at the stock ranch in the Iowa
reservation, east of the Oklahoma country, for some time
prior to the opening of the Oklahoma country to settle-
ment; that immediately prior to the 22nd day of April,
1889, he, together with two other friends, neither of
whom intended taking any lands in the Oklahoma coun-
try, went to the east line of the Oklahoma country, and
camped there on the night prior to the 22nd; that on the

morning of the 22nd, Paine located the meridian line, and prepared to make a ride into the Oklahoma country for the purpose of taking land; that he had a fleet saddle horse, upon which he expected to make the run; that on the morning of the 22nd, prior to the hour of noon, two of his friends, who had accompanied him to the line, drove into the Oklahoma country on a buckboard drawn by two horses, and carried with them Paine's bedding, his wagon sheet, his coat, some cooking utensils, and an ax; that shortly afterwards, and prior to the hour of noon, his other friend rode into the Oklahoma country, going to Guthrie, along the road that Payne expected to travel; that at the hour of noon Paine started for Guthrie, traveling at as rapid a rate as he could under the circumstances; that after traveling a short distance his saddle girth broke, and he was unable to fix it; that he traveled on ahead of the crowd who had started with him at the line, and, after traveling some eight miles, he saw in advance of him his friend by the roadside, dismounted, and his horse grazing; that he rode up to his friend, and his friend proposed to exchange horses, and he accepted the proposition, mounted his friend's horse, and rode on to the tract in dispute; that when he arrived there he found one of the friends who had preceded him, on the tract in dispute, with the buckboard and team and camping outfit, and he used the same for the purpose of making his settlement and establishing his residence on the land in controversy; that at the time he arrived on the land there were persons staking out town lots, and claiming the same for a town-site; that shortly after his arrival other persons arrived upon

the tract, and began staking out town lots, and asserting claims to the same as townsite occupants and settlers; that persons continued to arrive and stake out lots, survey and plat the tract, and to make improvements thereon, until the entire tract, within a short time, became occupied for townsite purposes; that one of Paine's friends assisted him in making his marks of settlement, remained with him and slept with him for a few nights, and, during the time he remained, became one of the selected officers of the townsite claimants; that Paine had in view, at the time he left the line, the particular tract in controversy, and started to it with the intention of making his settlement upon said tract. It is true that some of this testimony is controverted, but we are not permitted to determine its weight, or to pass upon controverted questions. Under this evidence, and the facts which were a matter of common notoriety, and those matters which were a part of the common history of the times, and which were generally known to all, and upon the mass of testimony submitted to the secretary, he found that Paine had in fact used a relay of horses in going into the country; that by reason of his friends going in ahead of time, and carrying his bedding and luggage, he had been relieved from carrying with him on the road those articles which were necessary for him to use in making his settlement and establishing his residence, and that he had received aid and assistance from those who had gone into the country ahead of the designated hour; that he had knowledge of facts from which any intelligent person would know that a town of considerable proportions would be immediately established upon the lands adjacent to the land office which had been located in that district. And from these facts and cir-

cumstances the secretary inferred and found as a fact, that Paine was not acting in good faith, and had not in good faith taken said land for a homestead. We are unable to say that there is no basis for this conclusion. If we were passing upon the weight of the testimony, or were permitted to review the evidence for the purpose of determining the question of fact, we might, as was said by the supreme court of the United States in the case of *Shepley v. Cowan,* 91 U. S. 330, perhaps doubt as to the sufficiency of the proofs presented. Those facts were, however, considered sufficient by the secretary of the interior upon which to base his conclusion, and the question is not open for our consideration. We cannot say that the conclusion or inference is unreasonable, or that it is irrational. On the contrary, we are of the opinion, after a careful examination of all the testimony submitted, that there is some evidence upon which to base the secretary's conclusion, and that it is based upon facts and testimony submitted in the contest proceedings, and upon which he had a right to act, and having exercised his prerogative of passing upon said testimony, and having based his findings and decision upon some evidence, we are not permitted to interfere with such finding. Having come to the conclusion that there were facts and circumstances contained in the record upon which the conclusion and finding of the secretary might be based, it follows that the complaint did not state such facts as would justify a court of equity in interfering with the decision of the secretary.

It is next contended by counsel for plaintiff in error that the demurrer should have been overruled for the reason that the complaint alleges that the secretary of the interior was imposed upon by Horace Speed, who was

then United States attorney for the Territory of Okla-homa, and who submitted a brief in said case on behalf of the townsite claimants, of the filing of which brief they received no notice, and which misled the secretary, and caused him to make findings of fact which were not justi-fied by the evidence in the case. There might be some weight in this contention, were it not for the further fact that the complaint contains the further allegation that the plaintiff in error filed a motion for review before the secretary of the interior, which motion was by the secre-tary considered and overruled. The imposition referred to in the authorities, which authorizes a court of equity to interfere, imports deceit or fraud. It means that an officer has been misled, and the opposite party injuriously affected, by some deceitful or fraudulent conduct on the part of the party practicing the imposition. The only contention in the complaint is that the secretary was misled by reason of the fact that the brief was filed with-out any notice to the adverse party. All the questions involved in the opinion of the secretary, and necessarily the effect of Mr. Speed's brief, were passed upon in the motion for review; and, if it could be consistently claimed that the secretary was misled in the first instance by such brief, there could be no basis for such claim after plaintiff had ample opportunity to meet the same in his application for review. In order to furnish a sufficient basis for a court of equity to interfere with a judgment of a court, or a decision of an executive officer, when acting within the scope of his authority, upon the ground of imposition, it must be clearly apparent from the allega-tions of the complaint that the court or officer was ac-tually misled by the conduct of the party practicing the imposition, and that a decision or judgment was rendered

different from what it would have been in the absence of such imposition. And where fraud, imposition, and misrepresentations are relied upon as grounds for interference by the court, they should be stated with such fullness and particularity as to show beyond question that they must necessarily have affected the action of the officers of the department. The allegations must be so certain, and the frauds or misrepresentations alleged of such a character, as to make it apparent to the court that they did, actually and in fact, mislead the officer. General allegations of fraud, misrepresentations, or imposition are not sufficient. All reasonable presumptions are in favor of the regularity of the decision, and that the officers were not misled or influenced by any conduct of the prevailing party. It cannot be presumed that any fraud, misrepresentation, or imposition would control the action of the secretary of the interior in determining the rights of adverse parties to public lands, when such alleged fraud and imposition were brought to his knowledge prior to a final decision of the case. See *Quinby v. Conlan*, 104 U. S. 420; *U. S. v. Atherton*, 102 U. S. 372.

Another cause set forth in the demurrer to the complaint is that there is a defect of parties defendant. In our judgment, this objection is well taken, and the demurrer was properly sustained. It is apparent from the complaint in this case: That the contest over this land was by certain homestead claimants, upon one side, and claimants for townsite purposes, on the other. The secretary of the interior finally decided said contest in favor of the townsite claimants, and appointed the defendants in this case a board of townsite trustees, under the provisions of the act of congress of May 14, 1890, to make entry of said

tract, together with other lands, for the use and benefit of the several occupants thereof, for purposes of trade and business. That said trustees did enter said tract. And that the patent from the United States, conveying said tract to them for such purpose, has been issued and delivered. By the provisions of the law under which they held the fee to said land, they have no interest therein. They are not vested with the power to dispose of said lands, except in the manner prescribed by law, and for the purpose of the trust created by statute. They are officers appointed under the act of congress for the purpose of more conveniently determining who are the beneficiaries of said trust, and of passing the title from the United States to such beneficiaries. They might make default in a case of this character, and thus destroy the rights of the real parties in interest.

In *McDaid v. Oklahoma*, 14 Sup. Ct. 59, Mr. Chief Justice Fuller, speaking for the supreme court of the United States, said: "As a matter of convenience, the trustees were the instrumentality for the transmission of title in respect of lands disposed of to actual holders, while the secretary, notwithstanding the patent, was the medium as to surplus lands, which he could not be if the legal title had immediately passed to the trustees by the patent for the whole site." The effect of the decision in the above cited case was that the issuance of a patent to the townsite trustees appointed under the act of May 14, 1890, (26 Stat. 109,) was not a final disposal of the government's title and control, but a conveyance in trust, to be carried out by the trustees under the control of the secretary, and that, while the title was held in trust for the occupying claimants, it was also held in trust, *sub modo*, for the

government, until the rightful claimants, and the undisposed of or surplus lands, were ascertained; and, until the trustees had conveyed, the title did not pass beyond the control of the executive department.

It is a well-settled rule in pleading that the real party in interest must always be made a party to the action. The decision of the secretary of the interior, which is attacked in this proceeding, and sought to be vacated, is not a decision in favor of the defendants in this case, but in favor of the opposite parties, claiming the lands for townsite purposes; and a court of equity should not attempt to determine their rights, or vacate a finding in their favor, until they shall have had an opportunity to be heard. The rule as to parties in equity pleadings is properly stated in Story, Eq. Pl. sec. 72:

"It is the constant aim of the courts of equity to do complete justice, by deciding upon and settling the rights of all persons interested in the subject-matter of the suit, so that the performance of the decree of the court may be perfectly safe to those who are compelled to obey it, and also that future litigation may be prevented. Hence the common expression, that 'courts of equity delight to do justice, and not by halves;' and, hence, also it is a general rule in equity that all persons materially interested, either legally, or beneficially, in the subject-matter of a suit, are to be made parties to it, either as plaintiffs or defendants, however numerous they may be, so that there may be a complete decree, which should bind them all."

And in section 149, speaking in relation to trustees, it is said:

"If trustees have not the power of absolute disposal, as in cases of trustees to convey to certain uses, the per-

sons claiming the benefit of the trust must be made parties."

In this case the trustees have no power of absolute disposal, but are required to convey to certain persons, and to certain uses. Hence this case comes squarely within the rule prescribed by Story. The plaintiff having failed to make the occupants of the townsite on the tract of land in controversy parties to this proceeding, the demurrer for defect of parties defendant was properly sustained. I have examined the entire record with a considerable degree of care, owing to the valuable interests involved, and the importance of the case, both to the plaintiff and to those adversely interested; and I find no error in the action of the district court.

---

VEEDER B. PAINE v. JOHN FOSTER *et al.*

(Filed Nov. 7, 1899.)

On petition for rehearing. Former opinion of Feb. 13, 1896, by Burford, J., adopted as modified.

Opinion of the court by

BURWELL, J.: This action involves 160 acres of land in the city of Guthrie, and was commenced in the district court of Logan county by Veeder B. Paine, the plaintiff herein, who claims to be the prior settler, against Foster *et al.*, the townsite trustees, to declare a resulting trust. The plaintiff attached to and made a part of his petition all of the evidence taken before the local land office on the trial of his contest case. A demurrer was filed to the petition and upon the hearing thereon it was sustained.

—17