## DISTRICT OF COLUMBIA *v.* JOHNSON.

## DISTRICT OF COLUMBIA *v.* SHECKELS.

### APPEALS FROM THE COURT OF CLAIMS.

Nos. 617, 618. Submitted January 4, 1897. — Decided February 15, 1897.

The act of February 13, 1895, c. 87, 28 Stat. 664, providing that in the adjudication of the claims against the District of Columbia therein referred to, the Court of Claims should allow the rates established and paid by the board of public works, simply conferred a gratuity upon the persons covered by its provisions, which became "due and payable" only from the time when the act which gave it was passed.

The claim of the District of Columbia to offset against any recovery here, the amount of the interest from June 1, 1874, on its counterclaim found due in its favor against the claimants, cannot be admitted.

The case is stated in the opinion.

*Mr. Assistant Attorney General Dodge* and *Mr. Special Assistant Attorney Howard* for appellants.

*Mr. J. J. Johnson* for Johnson, appellee.

*Mr. W. L. Cole* for Sheckels, appellee.

Mr. Justice Peckham delivered the opinion of the court.

These are appeals from the Court of Claims which gave judgments in favor of the appellees in actions commenced by them in December, 1880, pursuant to the provisions of the act

of June 16, 1880, c. 243, 21 Stat. 284, entitled "An act to provide for the settlement of all outstanding claims against the District of Columbia, and conferring jurisdiction on the Court of Claims to hear the same, and for other purposes." 31 C. Cl. 395.

The actions relate to work done under various contracts with the authorities of the District of Columbia between 1871 and 1876. These contracts were a few among a very large number of others, entered into with the authorities of the District of Columbia by many different persons, and relating to improvements then in contemplation and partly in course of completion in the city of Washington. Those in question here were originally made with one Peter McNamara, in or about the year 1872, for work in the nature of grading, sewering and filling various streets in that city. The contracts were in writing and stated the specific prices which were agreed upon for the various items of work to be performed under the contract.

At the time when these contracts were entered into, an act of Congress, approved February 21, 1871, c. 62, 16 Stat. 419, forbade the municipal authorities to contract except in writing, and forbade the allowance of extra compensation for work done under a written contract. Notwithstanding this legislative prohibition the board of public works then existing, without authority and in plain violation of the terms of the act, raised the prices agreed to be paid under the contracts with McNamara to what are called "board rates" (that is, rates allowed by the board of public works), the effect of which was to enormously increase the cost of the work done under them. In this way the work upon the improvements went on until in 1874, when Congress, by an act approved June 20, of that year, c. 337, 18 Stat. 116, abolished the District government and substituted another in its stead. The sixth section of the act constituted the First and Second Comptrollers of the Treasury of the United States a board of audit for the settlement of all unfunded or floating debts of the District of Columbia and of the board of public works as specified in such section, and the section further provided that the board of

audit should issue to each claimant a certificate signed by the board and countersigned by the comptroller of the District, stating the amount found to be due to each and on what account.

The seventh section of the act provided that the sinking fund commissioners of the District should cause bonds of the District of Columbia to be prepared, bearing date August 1, 1874, and payable 50 years thereafter, with interest at the rate of $3\frac{65}{100}$ per cent per annum, payable semi-annually, which bonds the sinking fund commissioners were authorized to exchange at par for like sums for any class of indebtedness named in the preceding sixth section, including certificates of the auditing board provided in the act. The section contained the following statement: "And the faith of the United States is hereby pledged that the United States will by proper proportional appropriations, as contemplated in this act, and by causing to be levied upon the property within said District such taxes as will do so, provide the revenues necessary to pay the interest on said bonds as the same may become due and payable, and create a sinking fund for the payment of the principal thereof at maturity."

By general resolution, approved March 14, 1876, 19 Stat. 211, Congress abolished the board of audit, and forbade the further issue of bonds.

By another act, approved June 11, 1878, c. 180, 20 Stat. 102, 104, 105, a permanent government was established for the District of Columbia, and in it the commissioners were required to annually make assessments for all expenses of the District, which, upon being submitted to the Secretary of the Treasury and approved by him, were to be laid before Congress; and it was then provided that "to the extent to which Congress shall approve of said assessments, Congress shall appropriate the amount of 50 per centum thereof, and the remaining 50 per centum of such approved assessments shall be levied and assessed upon the taxable property and privileges in said District other than the property of the United States and of the District of Columbia." In this manner Congress assumed the payment of a portion of the bonds and expenses of the District.

Under the authority of these statutes, the bonds of the District of Columbia, carrying interest at the rate of $3\frac{65}{100}$ per cent were issued and used to a certain extent in the payment of the indebtedness of the District incurred as above mentioned. In 1880 there still remained outstanding many certificates which had been delivered by the board of audit under the sixth section of the act of 1874, and many accounts against the District were also outstanding and unprovided for.

On the 16th of June, 1880, Congress passed "An act to provide for the settlement of all outstanding claims against the District of Columbia, and conferring jurisdiction on the Court of Claims to hear the same, and for other purposes." c. 243, 21 Stat. 284. That act conferred jurisdiction on the Court of Claims in regard to all such claims against the District of Columbia as then existed, arising out of contracts made by the late board of public works and extensions thereof, and to other claims mentioned in the section; and the act conferred upon the court the same power and provided that it should proceed in the same manner and should be governed by the same rules in respect to the mode of hearing, determination and adjudication of claims as in those against the United States.

The second section provided that the claims should be prosecuted by the contractor, his personal representative or his assignee, in the same manner and subject to the same rules, so far as applicable, as claims against the United States are prosecuted therein. Judgments were to be entered, and for the payment thereof the sixth section provided as follows:

"The Secretary of the Treasury is hereby authorized to demand of the sinking fund commissioner of the District of Columbia so many of the three sixty-five bonds authorized by act of Congress approved June twentieth, eighteen hundred and seventy-four, and acts amendatory thereof, as may be necessary for the payment of the judgments; and said sinking fund commissioner is hereby directed to issue and deliver to the Secretary of the Treasury the amount of three sixty-five bonds required to satisfy the judgments; which bonds shall be received by said claimant at par in payment of such judgments, and shall bear date August first, eighteen hundred and seventy-

four, and mature at the same time as other bonds of this issue: *Provided*, That before the delivery of such bonds as are issued in payment of judgments rendered as aforesaid on the claims aforesaid the coupons shall be detached therefrom from the date of said bonds to the day upon which such claims were due and payable; and the gross amount of such bonds heretofore and hereafter issued shall not exceed in the aggregate fifteen millions of dollars: *Provided*, The bonds issued by authority of this act shall be of no more binding force as to their payment on the Government of the United States than the three sixty-five bonds issued under authority of the act of June twentieth, eighteen hundred and seventy-four."

The mode of payment thus provided for was changed subsequently by a provision in the act approved March 3, 1881, c. 134, 21 Stat. 458, 466, as follows:.

"The Treasurer of the United States, as *ex officio* sinking fund commissioner, is hereby authorized, whenever in his opinion it will be more advantageous for the District of Columbia to do so, to sell the bonds authorized to be issued under the provisions of the sixth section of the act of the Congress of the United States, entitled ' An act to provide for the settle-. ment of all outstanding claims against the District of Columbia, and conferring jurisdiction on the Court of Claims to hear the same, and for other purposes,'. approved June sixteenth, eighteen hundred and eighty, for the satisfaction of the judgments which may be rendered by said Court of Claims under the provisions of said act, and pay the said judgments from the proceeds of said sales, instead of delivering to said judgment claimants the said bonds as provided for in said act.".

A large number of actions were brought against the District under these statutes, and among them the two actions in question. They were brought by the executrix of McNamara and by the assignee of a portion of his claim against the District for the purpose of recovering payment of the balance alleged. to be due under the various contracts which McNamara had secured from the municipal authorities. They were consolidated into one action on motion of the Attorney General, and proceeded to trial before a referee. The referee found upon

the trial a certain amount due the claimants by reason of the work done under the contracts mentioned in the actions.  He also found that there was due from the McNamara estate to the defendant, the District of Columbia, over and above the sum due from the District of Columbia to such estate, the amount of $6694.41, being the excess which had been paid to McNamara at "board rates" for work done under his contracts, and which sum was over and above the amount which was due him at the rates provided for in his contracts, and the referee further found that such amount was due to the defendant as a counterclaim June 1, 1874, with interest from that date.¹ The report of the referee having been filed was excepted to by claimants, but the defendant took no exception to the report, and there the matter rested until after the passage of the act of February 13, 1895, c. 87, 28 Stat. 664.

Prior to the passage of that act many of those contractors in whose favor "board rates" had been allowed instead of the prices which were contained in the contracts executed by them had brought suits against the District of Columbia of a nature similar to the two suits now here, and had based their claims as to the balance due them with reference to the board rates allowed for work under the contracts instead of the prices named in such contracts.  These claims had been held to be illegal, and the District of Columbia had successfully defended the actions and had succeeded in obtaining judgments allowing counterclaims in its favor for the difference between the prices as named in the contracts and those which had been paid by the board.  The Court of Claims had decided many cases to that effect, among which are those of *Roche*, 18 C. Cl. 217, *Barnard*, 20 C. Cl. 257, *Barnes*, 22 C. Cl. 366, and *Eslin*, 22 C. Cl. 160, and 29 C. Cl. 370.  This court had held the same proposition in *Barnard* v. *District of Columbia*, 127 U. S. 409.  The ground upon which the recovery on the counterclaim had been allowed was the illegality of altering the prices named in the contracts and of paying any greater sums for the work contracted to be done than was provided for in the written contracts, and payments beyond those sums were held to have been illegal.

Prior to the passage of the act of 1895, therefore, it is undisputed there was no claim, legal or equitable, which the parties could successfully maintain against the District of Columbia for the recovery at board rates for work done under written contracts with the municipal authorities, but such work could only be legally paid for at the prices named in the various contracts for such work.

Under the statute of 1880, it had been customary for the Court of Claims in deciding questions arising in this class of cases to state the day upon which the claims awarded by it had become due and payable, so that under the sixth section of the act of 1880, if payment were to be made in the $3\frac{65}{100}$ bonds, the coupons thereon might be detached from the date of the bonds to the date upon which the claims were by the judgment of the court found to have been due and payable. If instead of paying judgments by the delivery of the bonds as provided for in the act of 1880, the Treasurer of the United States proceeded under the act of March 3, 1881, to sell the bonds, he might do so, and with the proceeds pay the judgments rendered by the Court of Claims.

Matters were in this condition when the act of February 13, 1895, was passed, which provided as follows, 28 Stat. 664:

"That in the adjudication of claims brought under the provisions of the act entitled 'An act to provide for the settlement of all outstanding claims against the District of Columbia, and conferring jurisdiction on the Court of Claims to hear the same, and for other purposes,' approved the sixteenth of June, eighteen hundred and eighty (Twenty-first Statutes at Large, page two hundred and eighty-four), the Court of Claims shall allow the rates established and paid by the board of public works; and whenever said rates have not been allowed, the claimant or his personal representative shall be entitled, on motion made within sixty days after the passage of this act, to a new trial of such cause."

Under this act these claimants again presented their cases to the Court of Claims (no judgment having been entered upon the previous finding of the referee that the estate was indebted to the District), and thereupon the court granted

judgment to the administrator of McNamara and to the executrix of his assignee, respectively, by allowing the claimants compensation for work done under the contracts at the rates established and paid by the board of public works (instead of the contract prices), and the court held as a conclusion of law that those sums which were thus allowed by virtue of the act of 1895 were, according to its true intent and meaning, due and payable, one portion to the administrator of McNamara, February 1, 1872, and another portion February 1, 1876, and still another portion to the executrices of Theodore Sheckels, assignee, April 1, 1878. The effect of the finding is to allow interest on these sums secured under the provisions of the act of 1895, for about twenty years.

The claim of the appellant is that the amount allowed by the Court of Claims did not, as a matter of law, become due or payable until after the passage of the act of February 13, 1895, and the granting of a judgment by virtue of that act. The appellant further insists that, although the effect of the act was to extinguish its counterclaim so far as the principal sum was concerned, yet, as the referee found that principal sum was due the defendant, with interest from June 1, 1874, the claim for interest itself was not so extinguished, and that such interest should have been allowed as a counterclaim against the claim made by the estate of the contractor against the appellant.

In the opinion of the Court of Claims delivered in these cases it is conceded, and, indeed, there is no dispute in regard to it, that the finding of the referee was correct at the time he made it, as to the amount of the counterclaim legally existing in favor of the defendant and against the claimants, and the only ground upon which that finding can be attacked is based upon the act of February 13, 1895. The question, therefore, is as to the effect of that act. Did this enactment so far change existing facts and law as not only to permit a recovery of the board rates instead of the contract rates, but did it also make that sum "due and payable" 20 years before its passage? Under the holdings of the Court of Claims and of this court, it is perfectly apparent that the result of the passage of the act

of 1895 was simply to bestow a pure gratuity to the amount of the difference between the contract price and the board rates upon those persons included within its provisions. There is no element of a legal or an equitable claim within the proper meaning and signification of those words on the part of any of those who will profit by the act of 1895, against the municipal authorities of the District. That act bestowed a pure and simple gift.

Those who are to profit by it are those who had entered into a fair and legal written contract with the District authorities to do certain work at prices named in the contract and at a time when a law of Congress prohibited the granting of any extra compensation for contract work, and when it provided that all contracts should be in writing, signed by the parties making the same, and a copy thereof filed in the office of the secretary of the District. Viewed in the light of a gratuity, a gift, wholly without consideration, the statute itself must receive a strict construction; not such a construction as will prevent the fair meaning thereof from taking effect, but such as shall not be enlarged by inferences or implications not plainly to be drawn from the language of the act.

The United States has pledged its faith for the payment of claims arising out of these transactions when properly proved. Unless, therefore, the claim for interest against the government is clear and beyond question, it must be denied. Interest is not to be collected from the government in the absence of language specially providing for its payment. *United States* v. *Sherman*, 98 U. S. 565; *United States* v. *Verdier*, 164 U. S. 213. We are unable to see how it can be correctly stated that the claims in question became "due and payable" at the time of the completion of the work under these contracts more than twenty years ago, when it is conceded that but for the passage of the act of 1895 there was no legal or valid claim whatever, and that the right to any recovery depends upon the language used in that act. The statute of 1895 simply, as we have said, conferred a gratuity upon the persons covered by its provisions, and the reasonable construction of such an act is to say that the gratuity thus given becomes "due and payable" only

from the time when the act which gave it was passed. To make the amount of the gratuity thus given "due and payable" twenty years before the passage of the act giving it, so as thereby to allow interest from that time upon the amount of such gratuity, requires the clearest and most certain expression of legislative will to that effect. We do not find any such expression in the act here under consideration. Although it permits the Court of Claims to allow the rates used and paid by the board of public works, yet as that allowance is a mere gift, the further burden of twenty years' interest on it should not be added to the gift without the use of the very plainest language.

For these reasons we think the Court of Claims erred in holding that any portion of the moneys which might be due the claimants, and which arose by virtue of the act of 1895, became due and payable at any time before the passage of that act.

The claim of the appellant to offset against any recovery here, the amount of the interest from June 1, 1874, on its counterclaim found due in its favor against the claimants, in the report of the referee, we think cannot be admitted. The effect of the passage of the act of 1895 is in substance the same as if the counterclaim, which is the principal sum, had been paid, and when that is the case the interest becomes thereby extinguished. *Pacific Railroad* v. *United States,* 158 U. S. 118.

These views lead us to the conclusion that the judgments of the Court of Claims must be

　*Reversed, and the cases remanded to that court for further proceedings not inconsistent with this opinion.*