**UNITED STATES v. STANDARD OIL CO. OF CALIFORNIA et al.**

No. E-5.

District Court, S. D. California, N. D.

Dec. 4, 1937.

648

John W. Preston, Sp. Counsel, of San Francisco, Cal., and Annette Abbott Adams, Asst. Sp. Counsel, of Los Angeles, Cal., for the United States.

Oscar Lawler, of Los Angeles, Cal., Donald R. Richberg, of Washington, D. C.,

Eugene M. Prince, of San Francisco, Cal., and Wm. H. Burges, of El Paso, Tex., for Standard Oil Co.

Ray W. Hays, of Fresno, Cal., for defendants Carman, Fairbank, and Ranney.

Neil G. Locke, of Los Angeles, Cal., for defendant Southern California Gas Co.

W. G. Griffith, of Santa Barbara, Cal., for defendant Mary Rock.

YANKWICH, District Judge.

After the defendants' motion to transfer to the equity side of the court, and the government's motion to dismiss and strike certain defenses, had been disposed of by the opinion filed on August 25, 1937 (D.C., 20 F.Supp. 427), amended answers were filed under the leave granted by the court. Some of the new defenses, such as lack of jurisdiction in the Secretary of the Interior, discovery as a rule of property, estoppel and the like, embodied, in changed form, those stricken by the prior ruling. They were ordered stricken by memorandum dated October 16, 1927.

The cause went to trial on November 8, 1937, upon the issues remaining.

We refer to the prior opinion for a more detailed statement of the factual bases of the controversy.

In effect, the opinion meant that title to the lands was in the United States, under the decision of the Secretary of the Interior that the lands were of known mineral character on January 26, 1903, unless its finality was challenged successfully. The decision, made on January 24, 1936, a rehearing of which was denied on May 20, 1936, was received in evidence as a part of the government's chain of title. It and the other documentary evidence establish the government's title beyond dispute, unless (1) the defendants' new attack on the Secretary's decision and (2) their claim of title as transferees of the state of California are sustained. The two matters are so interrelated as to require joint treatment.

I. The Title of the United States as Determined by the Secretary of the Interior.

The defendants' claim of title is now grounded upon the proposition that there was *no evidence* before the Secretary of Interior to sustain his finding of title in the United States.

Having denied the contention of the defendants that they were entitled to a trial de novo before this court upon the issue of the known mineral character of the land, which carried title with it, the determination of the validity of the Secretary's decision calls for a review of the evidence presented during the contest. The full record was tendered as an exhibit to the new answers and offered and received in evidence. It is voluminous. The transcribed portions of it, excluding many exhibits, amount to nearly 10,000 typewritten pages. It was read by the court before the trial so that the divergent contentions as to its effect might be understood more adequately.

Ultimately, we are not called to justify the reasoning by which the Secretary arrived at his conclusions, or the facts to which he gave weight. The problem, under the principles laid down in the prior opinion, is to determine whether there is *any evidence* to sustain his finding that the land was known mineral on January 26, 1903.

In settling this question, we are not called to review the reasoning by which the conclusion was arrived at. Nor are we bound by it. We are not called to review the specific facts which the Secretary sets forth in his opinion as leading him to the conclusion. Nor do we have to agree with him as to the probative value to be given to them.

We are called to determine whether there is *any* evidence to sustain the ultimate conclusion, be that evidence singled out by the Secretary or other evidence in the record, to which his opinion does not refer.

The different factual steps which led him to the ultimate conclusion are of no importance. We are not required to accept them as findings of fact. The decision of the Secretary contained only one ultimate finding of fact, that is, *that the land was known to be mineral* on January 26, 1903.

In reviewing the record in the light of the principles declared in the previous opinion, we are called to answer the question: Is there *any evidence* to sustain this ultimate conclusion?

In answering, we bear in mind the criterion laid down by the Supreme Court for determining the mineral character of oil lands, in Diamond Coal & Coke Co. v. United States, 1914, 233 U.S. 236, 34 S. Ct. 507, 58 L.Ed. 936, and United States v. Southern Pacific Company, 1919, 251 U.S. 1, 40 S.Ct. 47, 64 L.Ed. 97, *(the latter involving the Elk Hills district in which the land in dispute here is situated).* In the

case last cited, the court, in ruling that the evidence before the trial court justified a finding that the lands were known as mineral, states: *"By this we mean that the known conditions at that time were such as reasonably to engender the belief that the lands contained oil of such quality and in such quantity as would render its extraction profitable and justify expenditures to that end."* United States v. Southern Pacific Company, 1919, 251 U.S. 1, 13, 40 S.Ct. 47, 49, 64 L. Ed. 97. (Italics added.)

In testing the evidence by this touchstone, the court referred to the fact that, in the particular case, witnesses called for the government *"gave it as their opinion,* having regard to the known conditions in 1903 and 1904, as just outlined, that the lands were valuable for oil, in that an ordinarily prudent man, understanding the hazards and rewards of oil mining and desiring to engage therein for profit, would be justified in purchasing the lands for such mining and making the expenditures incident to their development, and in that a competent geologist or expert in oil mining, if employed to advise in the matter, would have ample warrant for advising the purchase and expenditure." United States v. Southern Pacific Co., supra, 251 U.S. 1, at page 13, 40 S.Ct. 47, 49, 64 L.Ed. 97 (Italics added.)

The defendants insist that, under this ruling, it is necessary to show, first, that the observable conditions were such as to indicate to a trained geologist the mineral character of the land. The defendants are willing to admit that a trained geologist, on the basis of present observable conditions, could retroject his opinion in point of time and give it as his opinion that a geologist consulted prior to January 26, 1903, would have given his opinion that the lands were of known mineral character. They insist, however, that, if that element may be proved by expert testimony, there is a second element, i. e., that the observable conditions were such as to warrant a prudent man in purchasing the lands and making the expenditures for mineral development, which cannot be proved by the opinion evidence of an expert, who, *testifying today,* would say that such investment by a prudent man would have been justified and, if employed prior to January 26, 1903, he would have so advised. To my mind, this requirement goes in the very face of the statement just quoted, indicating that such opinion was *actually given* in that case and

considered in determining the character of the land.

But ultimately, we think the discussion is more or less academic. For, while the court, in discussing the evidence there, held that the facts were such as (1) to carry the conviction that the lands were mineral and (2) to induce a practical man to venture his substance in exploitation, we *do not think* it intended to lay down this twofold test as an absolute criterion by which the mineral character of land should always be determined. The criterion it laid down was the one appearing in the first quotation from the opinion, which is quoted above, and which, in the opinion, follows the analysis of testimony, and which it had also approved in Diamond Coal & Coke Co. v. United States, supra. The court there laid down the rule that the mineral character of land may be shown by deductions and inferences from the known conditions at the time.

If the facts are such as to engender the belief that the lands contain mineral in sufficient quantity to justify a prudent investment, it is immaterial whether the facts actually show that a prudent investor is *actually* found who states, *in retrospect,* that he would have made such investment. In other words, he whom the defendants call "the hypothetical practical man" *need not actually be shown to exist.* If the observable facts are such as to warrant the belief in the mineral character of lands, *whether they were such as would sanction investment is an inference which may be drawn by the trier of facts from the facts on which the conclusion as to the existence of the belief is grounded.*

If it were otherwise, *the fact* of absence of investment would be determinative. And if absence of investment be determinative then we are back to the test—that discovery is the only test for determining the oil-bearing character of lands. The decisions referred to and my own prior opinion reject this test. As stated in Diamond Coal & Coke Co. v. United States, supra, 233 U.S. 236, at page 249, 34 S.Ct. 507, 512, 58 L.Ed. 936: *"There is no fixed rule that lands become valuable for coal only through its actual discovery within their boundaries. On the contrary, they may, and often do, become so through adjacent disclosures and other surrounding or external conditions; and when that question arises in cases such as this, any evidence logically relevant to the issue is admissible, due regard being*

had to the time to which it must relate." (Italics added.) We need not review in detail the record before the Secretary or point to *all* the facts in it which satisfy the test thus laid down. The following outstanding facts may be referred to.

Scientists of high standing gave it as their view that the geology of the lands and the surrounding territory would have led a geologist or expert in oil mining, in 1903, to the conclusion that they were oil-bearing, so as to justify investment and exploitation. Practical oil men and prospectors who traversed the region long before 1903 testified to their belief and that of others, *antedating 1903,* that the Elk Hills were oil-bearing lands. The observable conditions upon the ground, in the vicinity, and in the region, of which the Elk Hills were a part, in the form of oil seepages, especially the so-called "Lamont seep." The position of the lands on the top of an anticlinal struc-

ture and the evidence as to the general acceptance, long before 1903, of the anticlinal theory as to the location of oil sands. The Duee survey made in November and December, 1901, after extended field work, and which reported the land to the state of California as mineral, and described it as "a geological formation, with asphaltum exudations that is regarded by experts as an almost sure indication of the presence of valuable petroleum deposits." The official acceptance by the state of this survey, which returned section 36 as mineral. The many mineral locations on the Elk Hills prior to 1903. The explorations and drillings in the neighborhood, sporadic though they were. The petition of certain miners to the Congress of the United States, in 1899, asserting the mineral character of the Elk Hills, including section 36, and protesting against their attempted location as agricultural lands,[1] and the consequent sus-

---

[1] The belief of the miners that mineral lands were being located as agricultural lands seems to have been shared by the Legislature of California in the years immediately preceding 1903. The session of 1897 repealed, by section 1, of an act approved April 1, 1897, (Laws of California, 1897, chapter 270, p. 438), certain acts relating to the sale of mineral lands by the state. In sections 2 and 3 of the same act it enacted as follows:

"Sec. 2. *When it shall be shown by affidavits or otherwise, to the satisfaction of the Surveyor-General, that any portion of a sixteenth or thirty-sixth section belonging to the State is valuable for its mineral deposits, the Surveyor-General shall not approve any application to purchase the same,* nor shall the Register of the State Land Office issue a certificate of purchase therefor, *until the question of the character of the land has been referred, for determination, to a court of competent jurisdiction,* in the manner provided by section thirty-four hundred and fourteen of the Political Code, and adjudged not to be valuable as mining land.

'Sec. 3. The sixteenth and thirty-sixth sections belonging to the State, in which there may be found valuable mineral deposits, are hereby declared to be *free and open to exploration,* occupation, and purchase of the United States, under the laws, rules, and regulations passed and prescribed by the United States for the sale of mineral lands." (Italics added.)

This indicates clearly that the Legislature was aware of the attempts to locate mineral lands as agricultural lands and

sought, by this, to protect the interests of both the state and the United States.

At the succeeding session, this situation again received the consideration of the Legislature. On February 20, 1901, the following joint resolution was adopted:

"Senate Joint Resolution No. 12, relative to attempted location of mineral oil lands as agricultural lands.

"Whereas, There is now pending in the land department at Washington, D. C., numerous applications of persons seeking to locate the oil mineral lands of this state in lieu of agricultural lands contained in various reservations pursuant to the act of June 4, 1897; and "Whereas, Bona fide locators of said lands as mineral lands have contested such application to select said oil lands under said act; and

"Whereas, The mineral locators and miners engaged in the development of oil lands in this state have developed an industry of great importance and value to this state and to its people; and

"Whereas, Certain of said matters having been judicially investigated before Judge E. M. Ross, judge of the ninth circuit court, southern district of California, and by him adjudged as to matters before him to be fraudulent and void applications for the selection of said oil lands as lieu lands; and

"Whereas, Said matters are pending for consideration and decision before the honorable secretary of the interior at Washington, D. C., and believing that the acquiring of title of said lands as agricultural lands under said act would be an injustice to the miners of this state and the persons who have actually developed the

pension from disposition in 1900 of the Elk Hills and adjacent lands. The periodical and other literature and publications of the day dealing with the oil possibilities of the region. The letter written June 25, 1909, to the Attorney General of the United States by the defendant Frank J. Carman, which, referring to conditions before 1903, stated the current contemporaneous opinion to have been that the sections of land then patented to the Southern Pacific Company, which were later the subject of the litigation in United States v. Southern Pacific Company, supra, and *two of which adjoin section 36,* were of known mineral character, prior to December 12, 1904.[2]

valuable character of said lands, *and would as we believe amount to a fraud upon the government of the United States;* now, therefore, be it

"Resolved by the senate and assembly of the State of California, jointly, *That the said honorable secretary of the interior is hereby requested and urged to fully and thoroughly investigate said matters on behalf of the government of the United States, and to thoroughly and carefully examine into the truth and honesty of the applications made to select said lands as agricultural lands, and he is hereby requested to take all necessary steps on behalf of the government of the United States to fully examine into said matters and ascertain if frauds have been committed in the attempted selection of said mineral lands as agricultural lands, and if the same be adjudged to have been fraudulent, then we request the said secretary of the interior to use all lawful ways and means to prevent the consummation of any attempted fraudulent selection of said lands.*

"Resolved, That the secretary of the senate be instructed to immediately transmit a copy of this resolution by mail to the secretary of interior, and to our senators and representatives in congress." Laws 1901, p. 943. (Italics added.)

It is not necessary to hold that these legislative enactments, which *were not* in the record before the Secretary, are entitled to consideration on the subject of notice to the state. They are referred to merely as showing that the general cry was heard that the mineral domain of the United States in California was being despoiled through fictitious agricultural entries on the school sections and was loud enough to have called for official action by the state, speaking through its Legislature.

[2] The text of the letter is: (in part) "Dear Sir:

"An association of gentlemen, ten in number, have appointed me their attorney and agent to investigate the validity of the title of certain lands in the western part of Kern County, California. These parties located this land for various minerals, including petroleum. The lands are situated on the axis of a well-marked anticlinal fold, which has attract-ed the attention of petroleum prospectors for the past ten years. *It is in the vicinity of an oil field that has been producing for more than that period, and has always been considered well within the oil belt.* In 1901 and 1902 two wells were drilled on the axis of this fold at points about five miles apart. Each of them struck some petroleum. In 1901, the lands in question were located for petroleum by parties who spent $8,000.00 in surveying (the land was unsurveyed by the United States) in properly monumenting, building a road and camp. The amount of this expenditure is merely cited, to show that these were not merely random locations made by parties who attached no particular value to their claims. These claims expired in two years, and the territory was again located in 1903. During the life of this latter set of claims, the Southern Pacific Ry. obtained a patent to the territory in question. At that time and for some years previous, it was generally known by oil men to be highly desirable territory, and by oil men operating in adjacent fields this anticlinal fold was well known and considered to be valuable oil territory. * * *

"Acting for my friends, who have located the territory hereinafter described, and who have found that the railroad holds a patent to the same, *I make the claim that the land was well known to be of mineral character at and before the time the patents were granted, and that circumstances were such that the railroad presumably knew of this fact.* I wish to emphasize the fact, that no oil development whatever has taken place along the anticlinal fold, or in the vicinity, since the date of patent that would cause the land in question to be considered of any more value now than at that time. *In other words, the value of the territory for oil is based solely upon considerations which were known at the date mentioned, and nothing has occurred since to enhance the value.*

"The land above cited consists of the following sections: Section 19, 21, 25, 27, 29, 33 and 35 in Township 30, South, R 23 East. Section 31 and 33 in Township 30 South, 24 East." (Italics added.) As the Secretary is not bound by the ordinary rules of evidence, the letter

These and other facts which might be alluded to are sufficient, under the limited scope of our power of review, as laid down in the prior opinion, to warrant our finding of a *factual basis* for the decision of the Secretary of the Interior holding the land to have been known mineral as of January 26, 1903. From these facts both the mineral character and the knowledge are deducible.

It is true that there was also scientific testimony to the contrary, i. e., that the observable conditions *were not such* as to lead to the belief that the land was oil-bearing and would warrant prudent investment. More, practical oil men, in large numbers, testified for the defendants, and stated their unwillingness to risk any money in that particular district.

■ But, at best, this testimony creates a conflict in the evidence, of the type referred to in United States v. Southern Pacific Company, supra, 251 U.S. 1, at page 13, 40 S.Ct. 47, 49, 64 L.Ed. 97. Concede that the evidential preponderance is on the part of the defendants, so as to warrant a contrary conclusion, by another. Nonetheless, the decision of the Secretary is conclusive if bottomed upon evidence which, if believed by him, justified the conclusion there reached. It is clear that there is such evidence as it is also clear that the Secretary believed it and acted on it. And it is also certain that, if it were necessary to show specific knowledge of the known mineral character of the land on the part of the state of California, the Duee survey alone would be sufficient to charge it and its transferees with such knowledge.

■ The contention that the Duee survey was fraudulent is beside the point. The ultimate finding of the Secretary cannot be impeached, even if it be based on fraudulent or perjured testimony. See Marquez v. Frishie, 1879, 101 U.S. 473, 25 L.Ed. 800; Vance v. Burbank, 1879, 101 U.S. 514, 25 L.Ed. 929; Quinby v. Conlan, 1881, 104 U.S. 420, 26 L.Ed. 800; Heath v. Wallace, 1891, 138 U.S. 573, 11 S.Ct. 380, 34 L.Ed. 1063; Johnson v. Drew, 1898, 171 U.S. 93, 18 S.Ct. 800, 43 L.Ed. 88; De Cambra v. Rogers, 1903, 189 U.S. 119, 23 S.Ct. 519, 47 L.Ed. 734; Estes v. Timmons, 1905, 199 U.S. 391, 26 S.Ct. 85, 50 L.Ed. 241; United States v. Hitchcock, 1907, 205 U.S. 80, 27 S.Ct. 423, 51 L.Ed. 718; Whitcomb v. White, 1909, 214 U.S. 15, 29 S.Ct. 599, 53 L. Ed. 889; Greenameyer v. Coate, 1909, 212 U.S. 434, 29 S.Ct. 345, 53 L.Ed. 587. See, also, Paine v. Foster, 1896, 9 Okl. 213, 53 P. 109; Van Patten v. Boyd, 1915, 20 N.M. 250, 150 P. 917.

■ Under the principles of law laid down in the prior opinion, the contingencies which might rob of finality the Secretary's decision that, because of the known mineral character of the lands here involved, title to them never left the United States and never vested in the state of California or its transferees, under the school land grant (Act March 3, 1853, c. 145, 10 Stat. 244), are: (1) Fraud on the part of the Secretary or other governmental officers or agencies in arriving at the decision. *This was not pleaded and was expressly renounced, both at the prior hearing and at the trial of the cause.* (2) An error of law, in the light of which the decision of the Secretary is without legal foundation, and amounts to an award of the defendants' property to one to whom it does not belong. The error urged in this respect was the failure to apply the discovery rule as a means of determining the mineral character of the lands and to set it up as a rule of property. The prior opinion held this doctrine to be untenable (*ein ueberwundener Standpunkt*) and justified its repudiation by the Secretary in assaying the evidence before him. (3) Absence of evidence to support the Secretary's decision. In what precedes, we have indicated the existence of a solid factual basis for it.

It follows that the determination of the Secretary of the Interior was right.

The government is entitled to a decree, as prayed for in the bill of complaint, declaring it to be the absolute owner of the lands and its products, to the proceeds from it, and that the defendants have no right, title, or interest in or to the same or any part of it.

## II. The Measure of Damages.

The government and the defendants have agreed on the returns from the sale of the oil and gas extracted from the premises. A commendable co-operation on the part of counsel makes an accounting by the court unnecessary. The government concedes that Standard Oil Company (to be referred to as "Standard") is entitled to de-

which, in a court proceeding, might have been, at best, admissible only as an admission against interest, becomes primary evidence of the highest type.

duct, from the value in place of the oil and gas converted, the cost of its drilling and operating expenses. See Mason v. United States, 1923, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396; Lightner Mining Co. v. Lane, 1912, 161 Cal. 689, 120 P. 771, Ann.Cas. 1913C, 1093; Drumm-Flato Commission Co. v. Edmisson, 1908, 208 U.S. 534, 28 S.Ct. 367, 52 L.Ed. 606; Montana Mining Co. v. St. Louis Mining & Milling Co., C.C.A.9, 1910, 183 F. 51. By this concession, the government, in effect, concedes good faith to Standard. For if good faith were absent, Standard would not be entitled to better treatment than those who fraudulently invade or appropriate a part of the public domain. See Pan-American Petroleum Company v. United States, C.C.A.9, 1926, 9 F.2d 761, 773; Pan-American Petroleum & Transport Co. v. United States, 1927, 273 U.S. 456, 457, 505–509, 47 S.Ct. 416, 424, 425, 71 L.Ed. 734; United States v. Pan-American Petroleum Company, D.C.1927, 24 F.2d 206, 208. Deducting the allowed items, the government's final claim for damages, omitting the interest item, is $7,818,868.63.

The sum includes five items which Standard would deduct and the government's claim for the reconditioning of the property in accordance with its requirements as a Naval Reserve.

We consider them in the order of their presentation at the trial, leaving, however, the question of interest to the last.

1. *Claim for Reconditioning of the Property.*

█ The government seeks the sum of $50,000 as the cost of conditioning the property in line with the policy of the Navy of preparing the wells for indefinite suspension. The amount includes the cost of clearing the surface and shutting in the wells. Undisputed expert testimony establishes both the need for, and the reasonableness of the estimated cost of, this work.

The government does not wish to continue the extraction of oil, but desires to reserve it for future naval uses. The wells were shut down, in 1932, at the request of the government. The object of damages in tort is full compensation for loss. California Civil Code, § 3333. The government cannot be made whole unless the property is restored to it in the condition in which it needs it.

The item is, therefore, allowed.

2. *Bonus, Land Costs and Royalties Paid.*

█ Standard has paid $1,896,819.67 in royalties to the defendant Carman.

In Mason v. United States, supra, 260 U.S. 545, at page 559, 43 S.Ct. 200, 204, 67 L.Ed. 396, the court held that, when royalties are paid by one who has not the right to exploit governmental lands, they are for oil which belonged to the government, and it is entitled to recover them, saying: "These royalties arose from and were paid out of proceeds of the oil; but this oil belonged to the plaintiff as owner of the property from which it had been taken. The defendants who received the royalties were obviously not entitled to retain them, and having incurred no expense in connection with the mining operations, were liable for the entire amount and the defendants who paid the royalties were jointly liable as co-wrongdoers. *A joint judgment against all was therefore proper.*" (Italics added.)

While conceding the right of the government to recover the royalties, Standard insists that no judgment in solido be entered. Fear is expressed that, having paid them once, it might be compelled to pay them again, should the defendant to whom they were paid not be financially able to repay, or (as I myself suggested at the trial), should the principle which denies contribution between joint tort-feasors (see Union Stock Yards Company v. Chicago, etc., R. R. Co., 1905, 196 U.S. 217, 25 S.Ct. 226, 49 L.Ed. 453, 2 Ann.Cas. 525; Goldsmith v. Koopman, C.C.A. 2, 1907, 152 F. 173; 13 C.J. 828) stand in the way of Standard's reimbursement.

The statement just given in Mason v. United States, supra, says plainly that recovery may be had from both the exploiting company and the royalty claimant. This being so, the contingency of double payment should not stand in the way of the award.

I have, heretofore, expressed the thought that the land costs, $100,000 paid for the Carman parcel as a bonus or advance royalty, and $17,023.79 paid for the Hay parcel, should be treated differently.

However, on further consideration, I am of the view that, whether these items be considered as advances on royalties or as cost of the land, they are not deductible. They are the price paid for the privilege of exploiting the land which did not belong to the persons granting it.

Grant, that, without the payments, Standard would not have exploited the land.

But, as the government is complaining of this exploitation of its property by Standard, there is no distinction in principle between the denial of the deductibility to royalties and bonus advances or royalties and money paid to others than the government itself for the use of the land. The cases in which recovery of the purchase price, *if paid to others than the government,* has been allowed, are cases in which the expenditure was caused directly or indirectly by the neglect of the government's agents, or they contributed to the illegal transaction. See City of Mobile v. Sullivan Timber Company, C.C.A.5, 1904, 129 F. 298; United States v. Debell, C.C.A.8, 1915, 227 F. 775. Again, as to the Carman property, we cannot draw a distinction between the royalties to be received and the advance royalties ($100,000) as the real consideration for the privilege of exploiting the land.

It follows that the items are not deductible.

3. *Taxes paid.*

 Standard seeks to be reimbursed for state and local taxes it has paid in the sum of $574,351.22 and income taxes computed at $500,010.89.

Section 349¾ of the California Code of Civil Procedure (as added by St.1935, p. 2285, § 1) provides specifically that "the costs" to the trespasser on oil land shall include taxes. The availability of this section as a measure of damages in this case will be treated separately. However, the problem here involved may be solved by reference to general principles.

Taxes cannot be placed in the same class with royalties or bonuses. They do not originate in any agreement to pay. Their payment could not have been avoided. Taxation is essentially compulsion.

Mere dispute as to the title is no warrant for declining to pay income tax. See North American Oil Consol. v. Burnet, 1932, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197. Deductions for income taxes have been allowed in infringement cases where the infringer acted under the honest belief of his right to manufacture the devices which were subsequently adjudged infringements. See Larson, Jr., Co. v. Wm. Wrigley, Jr. Co., 1928, 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800; Stromberg Motor Devices Company v. Detroit Trust Company, C.C.A.7, 1930, 44 F.2d 958; Stromberg Motor Devices Company v. Zenith-Detroit Corporation, C.C.A. 2, 1934, 73 F.2d 62, 65.

As stated in the Zenith-Detroit Corp. Case, allowance is made for taxes paid, in order to leave the infringer accountable for *"only the profits of which it actually has had the benefit."*

The monopoly of a patent is very valuable. It has its source in a governmental grant. If, notwithstanding this, the infringer, when acting in good faith, is not penalized for taxes paid out, there is a like reason for a similar procedure when dealing with one who, in honest belief of his title to them, exploits governmental lands which are later taken away from him by judicial decree.

In rate cases estimated income taxes are considered a proper *operating charge.* See Galveston Electric Company v. Galveston, 1922, 258 U.S. 388, 42 S.Ct. 351, 66 L.Ed. 678; Georgia Ry. & Power Co. v. R. R. Commission, 1923, 262 U.S. 625, 43 S.Ct. 680, 67 L.Ed. 1144.

With all due regard for the powers and attributes of sovereignty, it is well to remember that, when a sovereign comes into a court of equity seeking its aid to enforce its rights, *even as the owner of the public domain,* its claim should be tested by the same equitable principles which govern suits between private litigants, unless there be a special statute commanding a contrary rule. See United States v. Stinson, 1905, 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724; United States v. Debell, C.C.A.1915, 227 F. 775. As said by the Supreme Court in a very recent case, American Propellor & Mfg. Co. v. United States, 1937, 300 U.S. 475, 478, 57 S.Ct. 521, 523, 81 L.Ed. 751: "We have said (United States v. The Thekla, 266 U.S. 328, 339, 340, 341, 45 S.Ct. 112, 113, 69 L.Ed. 313): 'When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject-matter. The absence of legal liability in a case where but for its sovereignty it would be liable does not destroy the justice of the claim against it. * * * The reasons are strong for not obstructing the application of natural justice against the Government by technical formulas when justice can be done without endangering any public interest.' *If the principle thus stated is not strictly applicable, it at least suggests that the court should not affirm what is clearly an unjust and inequitable result unless under plain compulsion of law."* (Italics added.) See United States v. Den-

·ver & R. G. W. R. Co., C.C.A.8, 1926, 16 F. 2d 374.

It would be a shocking injustice, under these circumstances, to allow the government to retain the one-half million dollars paid to it as income tax under circumstances which would preclude all possibility of a refund. That the tax can only be approximated is not ground for denying reimbursement, the more so as the method of computation is one sanctioned by the government in income tax matters.

The items will, therefore, be allowed to Standard.

### 4. Overhead Expenses.

██ Standard should be allowed $144,968.-85 claimed as overhead expenses.

In the case of a corporation operating on a large scale, it is considered legitimate accounting practice to allocate general overhead expenses to particular operations upon a percentage basis. In our era of highly developed industrial organizations, management is a legitimate part of operations. See Lytle, Campbell & Co. v. Somers, Fitler & Todd Co., 1923, 276 Pa. 409, 413, 120 A. 409,·27 A.L.R. 41; 46 C.J. 1162. It is so considered in computing costs. See Ft. Dearborn Trust & Savings Bank v. Skelley Oil Co., 1930, 146 Okl. 179, 293 P. 557; New Domain Oil & Gas Co. v. McKinney, 1920, 188 Ky. 183, 221 S.W. 245.[3]

### 5. The Cost of the Compressor Plant.

██ The government objects to Standard's claim for the cost of a compressor plant—$381,748.88.

The plant was built in order to separate gasoline from wet gas so that the resulting gasoline and dry gas would be salable. It was also needed to boost the pressure on the gas well whenever it·got below that required by the gas companies. As testified by experts, the pressure must be boosted to a point where it will force the gas into the gas lines. It was built after the need for it had been investigated thoroughly. Its size corresponded to the need. The cessation of exploration finds value tied up in a plant not used to full capacity and no longer needed.

· However, we cannot apply so narrow a test to these matters.

Granted that Standard, in view of its good faith, is entitled to reimbursement for operating expenses, these should include the equipment which they, in their judgment, thought necessary for the particular operation. They should not be penalized for what later events may prove to have been a mistake of judgment. Unless a liberal attitude is adopted, we might find ourselves evaluating every item of cost by what other operators might have achieved under similar circumstances. We do not think this is a valid criterion.

### 6. Expenses after Shutdown.

██ Standard claims expenses after shutdown in the sum of $53,686.37. As the evidence shows clearly that the operation of the wells was discontinued at the request of the government in 1932, the cost of maintaining the status quo until the determination of the claim of title is clearly an allowable item of expense. The government in this case has asked for injunctive relief to prevent further trespass. Because of cessation of operations, it was not necessary to resort to this extraordinary remedy. When a defendant has kept up the property voluntarily, to abide the judgment of the court, a court of equity should not penalize it for so doing.

The item is, therefore, allowed to Standard.

██ In concluding the discussion on the disputed items, it is well to bear in mind that the record shows, at one·stage of the proceedings, delay on the part of the government in claiming title to this property, delay which even the counsel for the government admits, to some extent, to have been inexcusable. The drilling and other operations on the property were visible and known, at all times, by the government. They continued, with the government's assent. The wells were not shut down until 1932. While delay does not work estoppel against the government, it is well to consider it when dealing with claims for operating costs and expenses. See City of Mobile v. Sullivan Timber Co., C.C.A.5, 1904, 129 F. 298; United States v. Midway Northern Oil Company, D.C.Cal., 1916, 232 F. 619, 632. As there is no evidence of the value in place of the oil taken, other than

---

[3] In cost plus contracts, unless the percentage is based strictly on time and materials, overhead charges are allowed. See Lytle, Campbell & Co. v. Somers, Fitler & Todd Co., supra; Stone v. Wright Wire Company, 1908, 199 Mass. 306, 85 N.E. 471; Stein v. Strathmore Worsted Mills, 1915, 221 Mass. 86, 108 N. E. 1029; Fillmore v. Johnson, 1915, 221 Mass. 406, 109 N.E. 153.

the price received for it, by Standard, we should, under the rule laid down by the Supreme Court in Mason v. United States, supra, and other cases, determine its value by deducting from the price received the entire cost of operation.

Apposite to the situation is the language of Bean, District Judge, in United States v. Midway Northern Oil Company et al., supra (D.C.) 232 F. 619, at pages 632, 633: "The defendants were not *willful looters of the public domain, nor reckless trespassers thereon.* They acted on the advice of reputable counsel, *expended their money and labor in good faith,* relying upon a law of the United States and *in the honest belief that they were within their rights.* They were of course trespassers, because they were mistaken, but they should not be mulcted in damages beyond the *actual loss* to the government, and in my opinion this should be measured by the value of the oil taken and the damages, if any, which they have caused or permitted to the properties or their oil contents by the infiltration of water or otherwise." And see Redfield v. Ystalyfera Iron Company, 1884, 110 U.S. 174, 3 S.Ct. 570, 28 L.Ed. 109; United States v. Sanborn, 1890, 135 U.S. 271, 10 S.Ct. 812, 34 L.Ed. 112; Hammond v. United States, C.C.A.9, 1917, 246 F. 40; United States v. Carpenter, C.C.A.10, 1936, 84 F.2d 813.

We believe that the facts in this case, viewed through the eyes of a chancellor, call for a more liberal attitude on the subject of reimbursements than contended for by the government.

And our disagreement with the government, as to some of the items, is not so much a disagreement as to the law, but a disagreement as to the fair and equitable method to be used in balancing the equities as between the sovereign reclaiming a part of the public domain and an invader who, in good faith, in the solemn belief of the validity of his claim of title to a portion of the public domain, has spent its substance in developing it and protecting it, only to have the government, *after delay, admittedly inexcusable,* on the part of its officers, reclaim its own.

### III. The Claim of Interest on the Money Damages Allowed.

The government's claim of interest, which we have reserved for separate treatment, presents an interesting problem.

It is agreed that, although the cause is in equity, under the decision of the Supreme Court in Mason v. United States, 1923, 260 U.S. 545, 43 S.Ct. 200, 67 L.Ed. 396, the question of damages must be determined *not* according to equitable principles, but according to the law of damages of the state of California in conversion. And here the agreement ends.

The government insists that under section 3336 of the California Civil Code, it is entitled to the value of the oil converted, together with interest at the legal rate at the date of the conversion, until entry of judgment, subject only to the deductions of drilling and operating expenses.[4] For the purpose of computing the interest, the government requests that the monthly balances of moneys received from the exploitations of the wells on the property, as shown by the books of Standard, be used.[5]

Standard resists the claim and seeks to

---

[4] The section in full, as amended in 1931. reads:

"§ 3336. Damages for conversion of personal property.

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"First.—The value of the property at the time of the conversion, with the interest from that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and

"Second.—A fair compensation for the time and money properly expended in pursuit of the property. [Amendment approved June 5, 1931; Stats.1931, p. 1358.]"

In the original Code it read:

"The detriment caused by the wrongful conversion of personal property is presumed to be:

"First. The value of the property at the time of the conversion, with the interest from that time, or, where the action has been prosecuted with reasonable diligence, the highest market value of the property at any time between the conversion and the verdict, without interest, at the option of the injured party; and

"Second. A fair compensation for the time and money properly expended in pursuit of the property."

[5] Just why the monthly balances are chosen for the computation of interest has not been made clear. If the conversion of each quantity of oil from the wells is a separate and continuous tort, why

apply the limited measure of damages established by section 349¾ of the California Code of Civil Procedure. Section 3336 of the Civil Code lays down the general rule for damages for conversion of personal property. Section 349¾ of the Code of Civil Procedure, added in 1935, limits recovery for conversion of oil and gas to their

---

choose the month as a unit? Why not use the daily runs of the wells, or even the hourly extractions? Why use a time basis at all? Why not a quantity unit, using each gallon of oil as a basis, thus considering the extraction of each a separate conversion calling for its value plus interest and pyramiding it in a manner that would delight the most soulless usurer? When these questions were propounded at the trial to counsel for the government, they conceded that, under the government's. theory, the lowest unit of time or quantity might be chosen as the interest bearing unit. The only excuse given for the unit of monthly balances was that the method had been sanctioned in a case of fraudulent acquisition of federal oil lands. Pan-American Petroleum Company v. United States, 1927, 273 U.S. 456, 47 S.Ct. 416, 71 L.Ed. 734; United States v. Pan-American Petroleum Company et al.; D. C.Cal.1927, 24 F.2d 206. But here *we are not dealing with a fraudulent acquisition.* The transferees of the state, including Standard, acted, at all times *in good faith,* that is, in the belief in the validity of their title. And while the question of damages must be determined, as will appear hereafter, by the law of the state, not according to equity principles, when the challenge of unconstitutionality is leveled at a statute which limits the damages to be recovered for conversion to value, that is, to actual loss, without interest, these considerations become important in determining whether judicial sanction should be denied to such a law. And when the contrary rule would lead to grave injustice, there is greater reason for giving full effect to the presumption in favor of constitutionality. The allowance of interest at the regular rate of 7 per cent. at a time when money can be secured by governmental bodies and large corporations in the open market upon term loans for 2 or 3 per cent., would almost double the government's maximum claim. The claim of $7,818,868.63 would come, according to a hasty computation, to about $15,-600,000. Perhaps the California Legislature had in view the contingency of such a claim when it circumscribed. the measure of damages. That it sought to avoid injustice of this type may be gathered from its declaration of policy:

"Sec. 2. It is declared that it is common knowledge that there are thousands of oil and gas wells, of varying age, within this State, which are not wholly within land owned, leased or otherwise controlled by the past or present owner or operator of the well; that many such wells were drilled without intent so to invade the land of another; that until recent years there was no way for determining even approximately the subsurface location of the well; that now it is difficult and expensive to determine by any method of subsurface directional survey even the approximate subsurface location of the well, and in cases of many producing wells, to make such survey may jeopardize the well and its ability to produce; that in many instances wells could not have been drilled and hereafter cannot be drilled without some material deviation from the vertical; that the producing of most and perhaps all such wells has been and will be of great public benefit; that the possibility of commencement of large numbers of said causes of action, excepting where the acts hereafter are committed knowingly and intentionally as aforesaid, has brought great and undesirable confusion and uncertainty in the oil industry, may cause terrific financial distress and unemployment, and may cause the premature abandonment and prevent the full use of many wells, all contrary to true conservation of oil and gas; that the people have a public interest in removing said hazard and precluding said confusion, uncertainty, distress and unemployment, without doing violence to private rights; that vigilant persons can protect their rights within said one hundred eighty days; that public policy and the welfare of the people require the reduction of the time for commencement of such causes of action and that said one hundred eighty days is deemed reasonable; *that public policy and the welfare of the people require the measure of damages to be as above provided, in all cases where the invasion of the rights of another person has heretofore been or shall hereafter be by reason of any honest mistake of law or fact, either by the departure of a well from the vertical or otherwise."* (Italics added.) St.Cal.1935, p. 2286.

The legislative concern was the injustice arising from slant drilling. But they realized that similar injustice might arise through conversion of oil in other cases which called for confining the damages to *actual loss,* without the penalty of interest.

value at the time of extraction, without interest, after deducting all costs of development, operation, and production. It declares "costs" to include taxes "and interest on all expenditures from the date thereof." The section is made to apply retroactively "to causes of action existing when this section becomes effective."[6]

This feature of the law is attacked by the government as violative of the due process clause of the Fourteenth Amendment to the Constitution of the United States and of the provisions of the Constitution of California prohibiting special privileges or class legislation. Article 1, §§ 11, 21; article 4, § 25, subd. 19.[7]

The government insists that the right to recover interest, in addition to the value of personal property in conversion, is a common-law right which had its origin in a statute in the early reign of William IV

(1833–34) which made the allowance of interest discretionary with the court or jury. 8 R.C.L. 537; Chanslor-Canfield Midway Oil Company v. United States, C.C.A. 9, 1920, 266 F. 145; Umsted v. Johnson, C.C.A.8, 1936, 84 F.2d 859, 861.

Under section 4468 of the Political Code of California, which makes the common law of England, so far as it is not inconsistent with the Constitution and laws of California, the rule of decision, absent a statute, the common law would apply. Martin v. Superior Court, 1917, 176 Cal. 289, 168 P. 135, L.R.A.1918B, 313. As section 3336 goes back to a common-law principle, the government challenges the right of the Legislature to enact a different rule of damages, applicable only to the conversion of certain types of property. It denies the state's right to give retroactive effect to such an enactment and insists that it is de-

---

[6] The section in full reads:

"349¾. *Within one hundred eighty days.* Within one hundred eighty days:

"(a) An action to enjoin, abate, or for damages on account of, an underground trespass, use or occupancy, by means of a well drilled for oil or gas or both from a surface location on land other than real property in which the aggrieved party has some right, title or interest or in respect to which the aggrieved party has some right, title or interest.

"(b) An action for conversion or for the taking or removing of oil, gas or other liquid, or fluids by means of any such well.

"When any of said acts is by means of a new well the actual drilling of which is commenced after this section becomes effective, and such act was knowingly committed with actual intent to commit such act, the cause of action in such case shall not be deemed to have accrued until the discovery, by the aggrieved party, of the act or acts complained of; but in all other cases, and as to wells heretofore or hereafter drilled, the cause of action shall be deemed to have accrued ten days after the time when the well which is the subject of the cause of action was first placed on production.

"Notwithstanding the continuing character of any such act, there shall be but one cause of action for any such act, and the cause of action shall accrue as aforesaid.

"In all cases where oil or gas has been heretofore or is hereafter extracted from any existing or subsequently drilled well in this State, by a person without right but asserting a claim of right in good

faith or acting under an honest mistake of law or fact, the measure of damages, if there be any right of recovery under existing law, shall be the value of the oil or gas at the time of extraction, without interest, after deducting all costs of development, operation and production, which costs shall include taxes and interest on all expenditures from the date thereof.

"This section shall apply to causes of action existing when this section becomes effective. The time for commencement of existing causes of action which would be barred by this section within the first one hundred eighty days after this section becomes effective, shall be the said first one hundred eighty days.

"Whenever the term 'oil' is used in this section it shall be taken to include 'petroleum,' and the term 'gas' shall mean natural gas coming from the earth.

"The limitations prescribed by this section shall not apply to rights of action or actions to be brought in the name of or for the benefit of the people of this State, or of any county, city and county, city or other political subdivision of this State. [Added by St.Cal.1935, c. 852, p. 2285, § 1.]"

[7] It may seem anomalous that the government should raise the question of constitutionality. Yet under our American doctrine of judicial supremacy, which makes courts final arbiters of the constitutional validity of a statute, the government of the United States, when confronted with a statute not of its own making, may, like any other litigant, assert its inconsistency with the fundamental law of the land, the Constitution.

nied due process and is discriminated against, in defiance of both Federal and State Constitutions, when it is deprived of the full measure of damages existing at the time of the accrual of the cause of action, that is, at the time of the conversion of the oil through extraction, which measure of damages is of common-law origin. The right to receive interest from the date of conversion is claimed as a vested right immune from statutory interference. No constitutional immunity attaches to a particular remedy. Oshkosh Waterworks Company v. Oshkosh, 1903, 187 U.S. 437, 23 S.Ct. 234, 47 L.Ed. 249. No constitutional structure can be erected upon a remedy or part of a remedy, such as interest, the allowance of which, at common law, was discretionary. What is discretionary cannot be set up as a right, so as to withstand legislative change.

■■■■■ The argument to the contrary overlooks the place of damages in a cause of action. At the risk of being elementary, it is well to define certain terms—the more so as they have been, at times, a source of confusion. The right of action is merely the right to pursue a remedy. The cause of action is the concurrence of the facts which give rise to an enforceable claim. As said in Hutchinson v. Ainsworth, 1887, 73 Cal. 452, 15 P. 82, 84, 2 Am.St.Rep. 823: "The facts upon which the plaintiff's right to sue is based, and upon which the defendant's duty has arisen, coupled with the facts which constitute the latter's wrong, make up *the cause of action*."

A more extended definition is contained in Frost v. Witter, 1901, 132 Cal. 421, 64 P. 705, 707, 84 Am.St.Rep. 53: "The action therefore springs from the obligation, and hence the 'cause of action' is simply the obligation. This is in accordance with the view of Mr. Pomeroy, though expressed by him in new and somewhat awkward terms. Pom.Pl. & Prac. § 453. The obligation thus constituting the cause of action may be either ex contractu or ex delicto; and, again, the latter may be either for compensation or damages, or for restitution, as, e. g., the obligation of a wrongdoer to restore the property of another; for, though there is a distinction between actions brought for the recovery of damages or compensation and those brought for restitution, the former constituting actions in rem and the latter actions in personam, yet in either case the action is to enforce an obligation; nor can there be an action for any other purpose. 1 Aust.Jur. § 527. *The 'cause of action' is therefore to be distinguished also from the 'remedy,' which is simply the means by which the obligation or the corresponding action is effectuated; and also from the 'relief' sought.* Pom. Pl. & Prac. § 453." (Italics added.)

Damage is not the cause of action. It is merely a part of the remedy which the law allows for the injury resulting from a breach or wrong. Frost v. Witter, supra; Hurt v. Haering, 1922, 190 Cal. 198, 211 P. 228, 229; Bliss on Code Pleading, 1879, §§ 113–117; Phillips on Code Pleading, 1896, §§ 32, 33; Clark on Code Pleading, 1928, pp. 77–87; Yankwich on California Pleading, 1926, § 82; 1 Cor.Jur. p. 939; and cases cited in notes 20–26; 1 C.J.S., Actions, § 8(h) pp. 986, 987; Foot v. Edwards, 1855, 9 Fed.Cas. p. 358, No. 4,908; Box v. Chicago, Rock Island & Pacific R. R. Co., 1899, 107 Iowa 660, 78 N.W. 694, 698; and see Silas A. Harris, "What is a Cause of Action", 1928, 16 Cal.Law Rev. 459.

While a litigant may acquire a vested right to be compensated for loss immune from legislative encroachment by retroactive statute [Pritchard v. Norton, 1882, 106 U.S. 124, 132, 1 S.Ct. 102, 27 L.Ed. 104; Gibbes v. Zimmerman, 1933, 290 U.S. 326, 332, 54 S.Ct. 140, 142, 78 L.Ed. 342], no vested right exists *in the measure of compensation.*

"*There can be no vested right in a claim for damages for a tort,* not connected with or growing out of a contractual relation until judgment is rendered." Carson v. Gore-Meenan Company, D.C.Conn.1916, 229 F. 765, 767. (Italics added.)

In The Scotland, 1886, 118 U.S. 507, 518, 6 S.Ct. 1174, 1175, 30 L.Ed. 153, the majority of the court speaking through Mr. Justice Bradley, on the subject of damages in admiralty, says: "Were the libelants entitled to interest on the amount received from the strippings? In answering this question it must be borne in mind that *this is not a question of debt, but of damages. The limitation of those damages to the value of the ship does not make them cease to be damages. The allowance of interest on damages is not an absolute right.*" (Italics added.)

Mr. Justice Holmes, speaking of the amount of legal damages sustained by reason of a collision, says, in Boston Sand & Gravel Co. v. United States, 1928, 278 U.S.

41, 48, 49 S.Ct. 52, 54, 73 L.Ed. 170: "Of these, *interest is no part.*" (Italics added.)

Elsewhere, the court has said that the basic principle underlying common-law remedies is "That they shall afford only compensation for the injury suffered." Illinois Central R. R. v. Crail, 1930, 281 U.S. 57, 63, 50 S.Ct. 180, 181, 74 L.Ed. 699, 67 A.L.R. 1423.

When a right of action exists and has matured into a cause of action, a legislative enactment which affects the remedy is valid, even if the remedy remaining is less efficacious and, in actual practice, may result in a smaller recovery than before. Provided, of course, a remedy is left which allows a means of compensation for actual loss. As said in Gibbes v. Zimmerman, supra, 290 U.S. 326, at page 332, 54 S.Ct. 140, 142, 78 L.Ed. 342: "The appellant says the Act of March 9 arbitrarily deprives him of a remedy for the enforcement of stockholders' liability, *which remedy was his property, and was taken from him without due process.* But although a vested cause of action is property and is protected from arbitrary interference (Pritchard v. Norton, 106 U.S. 124, 132, 1 S.Ct. 102, 27 L.Ed. 104, the appellant has no property, in the constitutional sense, in any particular form of remedy; all that he is guaranteed by the Fourteenth Amendment is the preservation of his substantial *right to redress by some effective procedure.* Iowa Central Ry. Co. v. Iowa, 160 U.S. 389, 393, 16 S.Ct. 344, 40 L.Ed. 467; Backus v. Fort St. Union Depot Company, 169 U.S. 557, 571, 18 S.Ct. 445, 42 L.Ed. 853; Crane v. Hahlo, 258 U.S. 142, 147, 42 S.Ct. 214, 66 L.Ed. 514; Hardware Dealers Mut. Fire Ins. Co. v. Glidden Company, 284 U.S. 151, 158, 52 S.Ct. 69, 71, 76 L.Ed. 214." (Italics added.)

Many such enactments have received the constitutional sanction of our highest court. Thus, a retroactive statute denying the right to a civil action resulting in an invasion of the rights of property of another, if done by a person acting under military authority or orders. Drehman v. Stifle, 1869, 8 Wall 595, 19 L.Ed. 508. An act repealing a usury statute and abolishing the defense of usury to existing causes of action. Ewell v. Daggs, 1883, 108 U.S. 143, 2 S.Ct. 408, 27 L.Ed. 682. A law reducing the rate of interest upon judgments previously obtained even when retroactively applied to one obtained previously to the passage of the act. Morley v. Lake Shore & M. S. Ry. Co., 1892, 146 U.S. 162, 13 S.Ct. 54, 36 L.Ed. 925. A retroactive statute giving the state the right to forfeit lands for nonpayment of installments due from purchaser. Waggoner v. Flack, 1903, 188 U.S. 595, 23 S.Ct. 345, 47 L.Ed. 609. A statute denying interest on judgments against a county on county warrants. Missouri & Arkansas Lumber & Mining Co. v. Greenwood Dist. of Sebastian County, 1919, 249 U.S. 170, 171, 39 S.Ct. 202, 63 L.Ed. 538. A retroactive statute adding interest to recoveries in actions for unliquidated damages caused by breach of contract. Funkhouser v. J. B. Preston Co., 1933, 290 U.S. 163, 54 S.Ct. 134, 78 L.Ed. 243. A statute depriving bank depositors of the remedy of stockholders' liability, and substituting summary liquidation by the state. Gibbes v. Zimmerman, supra.

Mere retroactivity is not an unconstitutional vice. Funkhouser v. Preston Company, supra; League v. Texas, 1902, 184 U.S. 156, 22 S.Ct. 475, 46 L.Ed. 478. When section 3336 of the California Civil Code, under which the government seeks interest, was first enacted, its retroactive feature was challenged as unconstitutional. The Supreme Court of California in Tulley v. Tranor, 1878, 53 Cal. 274, 280, ruled otherwise, saying: "We can conceive of no principle of constitutional law which is violated by a *change* in this rule, unless, at least, *the new rule on its face deprives the party of every reasonable method of securing just compensation.* No case has been referred to in which it has been held that to change an arbitrary and statutory rule of damages in cases of *tort* was a deprivation of any vested right of one who had previously suffered the wrong, and we can see no reason why it should be so held, even if it should be made to appear in a particular case that the plaintiff would not recover as much as he would have done had the former rule been continued."[8] (Italics added.)

---

[8] The special counsel for the government, himself a former justice of the Supreme Court of California, at the oral argument, used rather vigorous language in denouncing this decision. The claim that it had never been cited or referred to is not borne out by the record. In Potts v. Paxton, 1915, 171 Cal. 493, 498, 153 P. 957, 959 (a case cited in the government's opening brief to the proposition that the choice of the measure of damages under the section is in the plaintiff), it was cited by the Supreme Court of California as authority for the

To me, the conclusion is inescapable that the retroactive denial of interest does not impinge upon any constitutional limitations.

▇▇▇▇▇ Nor do I think that the statute is vulnerable on the score of discrimination, because it establishes a different rule of damages for conversion of oil and gas than for the conversion of other personal property. Inequality and the failure to include within a group other groups which are similarly situated is not a valid constitutional objection. Classification for legislative purposes is justified when there is reasonable ground for the differentiation. See Lindsley v. Natural Carbonic Gas Company, 1911, 220 U.S. 61, 78, 79, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912C, 160; Henderson Company v. Thompson, 1937, 300 U.S. 258, 265, 57 S.Ct. 447, 451, 81 L.Ed. 632.[9]

Oil is mining under California law. And mining has always been considered a proper subject for separate treatment or classification for regulatory or other purposes. See In re Great Western Petroleum Corp., D.C.Cal.1936, 16 F.Supp. 247; Wheeler v. Kraner, Cal.App.1937, 69 P.2d 881. So has oil, as distinguished from solid minerals. See Ohio Oil Company v. Indiana (No. 1), 1900, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; · Champlin Refining Company v. Corporation Commission, 1932, 286 U.S. 210, 233, 52 S.Ct. 559, 564, 76 L.Ed 1062, 86 A.L.R. 403; In re Lathrap, C.C.A.9, 1932, 61 F.2d 37, 40; People v. Associated Oil Company, 1930, 211 Cal. 93, 101, 294 P. 717; Bandini Petroleum Company v. Superior Court, 1930, 110 Cal.App. 123, 293 P. 899, affirmed, 1931, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826.

Oil is a natural resource. Upon this score many regulations curtailing its exploitation and aiming at its preservation and the prevention of its waste, through unlimited exploitation by the owners of the land on which it is found, have been sustained. See Ohio Oil Company v. Indiana, 1900, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; People ex rel. Stevenot v. Associated Oil Company, 1930, 211 Cal. 93, 294 P. 717; Bandini Petroleum Company v. Superior Court, 1931, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; Champlin Refining Company v. Corporation Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403.

It may be asked: Why should a different rule of damages prevail if you trespass on my oil-bearing land and steal my subterranean oil than if you trespass on my gold-mining claim and steal my gold? Or if you break into my close and steal my cow? The answer is obvious. If I steal your cow from your pasture, there can be no doubt that it is your cow. If I extract your gold or other solid minerals from your land, while, as counsel for the government says, "the danger of transgressing the plane of the perpendicular * * * also exists," nonetheless the danger of extracting from another's property through such deviation is insignificant and there is certainty that the mineral so extracted is yours. But if I steal oil by extracting it from the oil sands lying thousands of feet under your land, I tap a pool which underlies not only your but your neighbor's property as well. So that the oil I take by the act of trespass on your property may be, in reality, that of your neighbor. I may really be drawing his share of the pool even without the slant drilling of his surface. See Kelley v. Ohio Oil Company, 1897, 57 Ohio St. 317, 49 N.E. 399, 39 L.R.A. 765, 63 Am.St.Rep. 721;

---

equitableness of the rule of damages laid down in section 3336. It was cited on other points in Agmar v. Solomon, 1927, 87 Cal.App. 127, 131, 261 P. 1029, 1031; in Williams v. Myers, 1930, 110 Cal.App. 265, 285, 294 P. 61, 69. The case, has never been overruled and the fact that it has been cited on various points as late as 1930 shows that the high courts of California do not think that time has dimmed its validity as authority. Social policy and sound constitutional doctrine required a widening, not a narrowing, of constitutional concepts. They call for the expansion rather than the recession of the constitutional frontier. See Euclid v. Ambler Realty Company, 1926, 272 U.S. 379, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.

L.R. 1016; Home Bldg. & Loan Ass'n v. Blaisdell, 1934, 290 U.S. 398, 54 S. Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481; Nebbia v. New York, 1934, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469. So we should not, by a strict construction, set up as a vested right the denial of the right to recover interest in conversion over and above the value of the property actually converted.

9 So much is being written constantly on the subject that it is not necessary to burden the reports with a review of the cases on the subject. The most important ones arising in the Supreme Court are collated in the writer's dissent to the opinion in Morf v. Ingels, D.C.Cal.1936, 14 F.Supp. 922.

Hague v. Wheeler, 1893, 157 Pa. 324, 27 A. 714, 22 L.R.A. 141, 37 Am.St.Rep. 736; Barnard v. Monongahela Natural Gas Co., 1907, 216 Pa. 362, 65 A. 801; Prairie Oil & Gas. Co. v. State, Tex.Com.App.1921, 231 S. W. 1088, modifying, Tex.Civ.App.1919, 214 S.W. 363; People's Gas Company v. Tyner, 1892, 131 Ind. 277, 31 N.E. 59, 16 L.R.A. 443, 31 Am.St.Rep. 433; Gain v. South Penn Oil Co., 1915, 76 W.Va. 769, 86 S.E. 883, L.R.A.1916B, 1002; Champlin Refining Company v. Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403; Bandini Petroleum Company v. Superior Court, 1931, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826. This geological fact, due to the pool formation in which oil is found, and its fugitive nature, a fact which has given rise to the practice of drilling offset wells on adjacent property to prevent the tapping of one's oil by a neighbor's drilling, is, in itself, a sufficient ground of differentiation.

It gives constitutional sanction to the special classification of oil and the establishment of a different rule of damage for the conversion of oil.

If to this we add the nature of oil as a natural resource and the interest of the state in curtailing the unlimited right of ownership, through regulatory measures which could not be sustained in the case of other property (see Andrew A. Bruce, The Oil Cases and the Public Interest, 1933, 19 American Bar Association Journal, pp. 83, 168; Maurice H. Merrill, Stabilization of the Oil Industry and Due Process of Law, 1930, 3 Southern California Law Review, 396; Leon R. Yankwich, Courts and the Changing Industrial Scene, with Special Reference to the Oil Industry, 1936, 22 American Bar Association Journal, p. 314), the conclusion of validity seems inescapable.[10]

The enactment being valid, the government's claim of interest on the damages cannot be allowed.

The government is entitled to a decree as prayed for in its bill of complaint declaring it to be the absolute owner of the lands and quieting its title against all defendants, and to damages in the sum of $6,214,102.42, with interest from the date of the decree only.

Findings and decree accordingly under rule 44.

Exception to the defendants to the whole decree and to the government on the items of damage objected to by it, and allowed.

---

[10] We need not discuss the effect of the enactment as a statute of limitations. The defendants have not pleaded it as such. They rely on it solely for the measure of damages. As a statute of limitations the government would not be bound by it. See United States v. Thompson, 1878, 98 U.S. 486, 25 L.Ed. 194; United ed States v. Norris, C.C.A. 8, 1915, 222 F. 14; United States v. Pitan, D.C.So.Dak. 1915, 224 F. 604.

Nor does the assumed liability of the government for interest on the Standard's expenditures require lengthy treatment. Standard does not claim interest. As interest cannot, ordinarily, be charged against the government on claims due from it (see United States v. Verdier, 1896, 164 U.S. 213, 17 S.Ct. 42, 41 L. Ed. 407; District of Columbia v. Johnson, 1897, 165 U.S. 330, 17 S.Ct. 362, 41 L.Ed. 734; Boston Sand & Gravel Co. v. United States, 1928, 278 U.S. 41, 49 S.Ct. 52, and note thereto found at 73 L.Ed. 170) it may be assumed that the legislators were cognizant of this principle and that the provision as to interest to the wrongdoer was not intended to apply to the United States.

Allowance of interest to one side and not to the other is also made one of the grounds of the government's attack on the constitutionality of the section. If constitutionality depended on equality, we would be compelled to interpret the statute so as to avoid unconstitutionality by holding that the provision allowing interest to the wrongdoer was void, thus placing both the wrongdoer and the wronged in the same class and allowing them to recover only on the basis of actual detriment suffered without interest.